[Cite as *Buckingham v. Buckingham*, 2018-Ohio-2039.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

| | | |
|---|---|---|
| JAY BUCKINGHAM | : | |
| | : | |
| *Plaintiff-Appellant* | : | Appellate Case No. 2017-CA-31 |
| | : | |
| v. | : | Trial Court Case No. 2013-DR-153 |
| | : | |
| NANCY BUCKINGHAM | : | (Domestic Relations Appeal) |
| | : | |
| *Defendant-Appellee* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 25th day of May, 2018.

. . . . . . . . . . .

KENT J. DEPOORTER, Atty. Reg. No. 0058487, 7501 Paragon Road, Dayton, Ohio 45459
      Attorney for Plaintiff-Appellant


F. ANN CROSSMAN, Atty. Reg. No. 0043525, and MICHELLE M. MACIOROWSKI, Atty. Reg. No. 0067692, 7051 Clyo Road, Dayton, Ohio 45459
      Attorneys for Defendant-Appellee

. . . . . . . . . . . . .


WELBAUM, P.J.

{¶ 1} In this case, Plaintiff-Appellant, Jay Buckingham ("Jay"), appeals from a trial court decision finding him in contempt and ordering him to pay attorney and expert fees to Defendant-Appellee, Nancy Buckingham ("Nancy"). As grounds for his appeal, Jay contends that the trial court's contempt finding was an abuse of discretion and was against the manifest weight of the evidence. Jay further contends that the trial court's decision was an abuse of discretion and was against the manifest weight of the evidence in other ways, including in the denial of the use of Jay's health savings account ("HSA") to pay the property settlement, in the award of expert witness fees, and in the award of attorney fees. In addition, Jay contends that the trial court's failure to find Nancy in contempt was an abuse of discretion and was against the manifest weight of the evidence.

{¶ 2} For the reasons that follow, we conclude that the trial court did not abuse its discretion in finding Jay in contempt, because Jay failed to comply with the requirements for paying the property settlement, nor was the court's decision against the manifest weight of the evidence. The trial court also did not abuse its discretion in rejecting the use of Jay's HSA to pay the property settlement, in failing to hold Nancy in contempt, or in awarding attorney fees and litigation expenses to Nancy. The court did err in awarding $1,250 for one expert, because the record did not include adequate documentation of the expert's fees. Accordingly, the judgment of the trial court is reversed with respect to the trial court's award of expert fees for David Suich in the amount of $1,250. In all other respects, the trial court's judgment is affirmed.

I. Facts and Course of Proceedings

{¶ 3} In June 2011, Jay filed a divorce action against Nancy, and she filed a counterclaim for divorce. That action was dismissed without prejudice in April 2013, and Jay then filed a second complaint for divorce in June 2013. The parties had been married since May 1994, and no children were born as a result of their marriage.

{¶ 4} In June 2013, the parties filed an agreed order, stating that Jay would receive free and clear certain properties, and that Nancy had received $198,750 in compensation for her interest in the properties. They also agreed that Nancy would be paid temporary spousal support of $5,000 per month, and that Jay would receive credit for spousal support he had paid since a temporary support order was entered in August 2011.

{¶ 5} On July 22, 2013, the parties appeared in court and entered an agreement regarding the divorce into the record. After the hearing, the trial court filed an order directing Nancy's attorney to prepare and submit the divorce decree; Jay's attorney was directed to prepare any qualified domestic relations orders ("QDROs") and other orders to transfer accounts. On October 8, 2013, Nancy's counsel filed a notice of presentation of final judgment and decree of divorce, and noted that she had been asked by Jay's attorney to make changes in the decree that were inaccurate based on the agreement that had been read into the record. The court then ordered Jay to submit his own proposed divorce decree, which Jay subsequently filed on October 25, 2013. On November 25, 2013, the trial court adopted the divorce decree that Nancy had proposed.

{¶ 6} Jay filed a notice of appeal from the divorce judgment on December 23, 2013. Nancy then filed a motion for attorney fees on January 16, 2014, based on the fact that the parties had agreed to the decree, but Jay had refused to sign it. On March 25, 2014, Jay moved to dismiss the request for attorney fees, contending that it was premature.

Subsequently, Nancy moved to withdraw her attorney fee request, subject to refiling on presentation of Jay's appellate brief, which was due in early April 2014. The trial court granted Nancy's motion to withdraw the fee request.

{¶ 7} On December 30, 2014, we filed an opinion rejecting Jay's two assignments of error and affirming the trial court's judgment. *See Buckingham v. Buckingham*, 2d Dist. Greene No. 2013-CA-77, 2014-Ohio-5798.

{¶ 8} On January 28, 2015, Nancy filed a motion for contempt and a request for attorney fees with the trial court. The contempt motion was based on several matters: (1) Jay's alleged improper transfer of funds into her retirement account without her consent or knowledge; (2) Jay's alleged violation of the divorce decree when he attempted to include assets that had been awarded to her within his property settlement payments; (3) Jay's refusal to sign a promissory note that had been presented to him and his substitution of his own modified note; and (4) Jay's failure to comply with provisions in the decree pertaining to designation of Nancy as a beneficiary on his life insurance policy, his failure to provide proof of life insurance when asked, and his failure to respond to Nancy's request for proof of refinancing of certain property. In addition to asking that Jay be held in contempt, Nancy asked for an award of attorney fees. On the same day, Nancy also filed a motion asking the trial court to award her attorney fees in connection with Jay's pursuit of the appeal.

{¶ 9} On February 11, 2015, Jay filed a motion asking the trial court to hold Nancy in contempt for failing to accept $50,000 from his IRA and for failing to set up a HSA so he could transfer $25,000 into that account. Nancy then filed an amended motion for contempt and request for attorney fees on March 23, 2015.

{¶ 10} Hearings were held on the contempt motions on July 10, 2015, March 15, 2016, June 9, 2016, June 10, 2016, and August 8, 2016. During the proceedings, various other motions were filed, including motions to compel, motions in limine, and additional contempt motions. On October 29, 2015, Jay filed another motion for contempt, asking the court to hold Nancy in contempt for failing to accept additional HSA funds and funds from Jay's 401(k) account. In addition, Jay filed a motion for contempt on January 8, 2016, asking the court to hold Nancy in contempt because she had asked the Internal Revenue Service ("IRS") for an abatement of excise taxes on qualified funds that had been transferred to her IRA.

{¶ 11} Nancy also filed an additional motion for contempt on March 7, 2016, alleging that Jay had failed to pay the property settlement pursuant to the divorce decree filed on November 25, 2013.

{¶ 12} On March 24, 2017, the trial court filed a decision and entry finding Jay in willful contempt for attempting to credit himself with payment of the property settlement by using assets that had been awarded to Nancy in the divorce decree. The court ordered Jay to adjust his accounting by eliminating the improper items and to pay Nancy $23,072.51 plus any interest due within 30 days in order to purge the contempt.

{¶ 13} The court also concluded that Nancy was not in contempt for contacting the IRS, as she was attempting to protect herself against a 6% excise tax associated with Jay's actions in overfunding her IRA account. In addition, the court found that Jay had violated the divorce decree or had acted incorrectly in several respects, including failing to designate Nancy as a beneficiary on life insurance policies, overfunding Nancy's retirement account without her knowledge, and engaging in self-help regarding a

promissory note rather than approaching the court. The court declined to find Jay in contempt concerning these matters, but indicated that as a result of Jay's actions, Nancy had incurred expert and attorney fees.

{¶ 14} Further, the court overruled Jay's motion for contempt regarding Nancy's refusal to accept HSA payments, due to Nancy's legitimate concern about whether such funds could be used to pay the property settlement. The court additionally concluded that use of HSA funds was not contemplated at the time of the decree and improperly restricted Nancy's use of the funds. And finally, the court concluded that Jay failed to present proper paperwork to accomplish a transfer of funds. The court, therefore, overruled Jay's motion for contempt in its entirety.

{¶ 15} The court noted that it could impose attorney fees under R.C. 3105.73(B) for post-decree motions, as equitable. Finding that Nancy was the economically disadvantaged party, and that Jay had caused problems by taking unilateral actions and by engaging in self-help, the court ordered Jay to pay $11,000 for an expert Nancy hired to work with the IRS for a refund of a penalty payment of excise tax and to testify; $10,000 for an attorney Nancy hired to advise her on the promissory note and to testify; and $1,250 for an attorney who testified about ERISA matters. The court also ordered Jay to pay Nancy's counsel $40,000 of more than $99,000 in attorney fees incurred for filing contempt motions and in defending against Jay's contempt motions. Finally, the court ordered Jay to pay Nancy $15,000 for fees incurred in connection with Jay's appeal.

{¶ 16} Jay timely appealed from the trial court's decision.

II.   Finding of Contempt

{¶ 17} Jay's First Assignment of Error states that:

The Trial Court Abused Its Discretion and Its Findings Were Against the Manifest Weight of the Evidence in Finding That the Plaintiff Is In Contempt of Court for Failing to Pay the First Two Years of Payments in the Manner Specified in the Decree.

{¶ 18} Under this assignment of error, Jay contends that the trial court abused its discretion by finding him in contempt for failing to pay the amounts due in the first two years of payments in the manner specified in the decree. Jay agrees that he owed the amount stated by the court ($488,179), but contends that the amounts he paid and offered to pay exceeded that amount. In this regard, Jay argues that he properly included various accounts in Nancy's name that were awarded to him in the divorce, plus a HSA account of $25,000, which would have exceeded the amount due. Jay further argues that until the trial court filed its decision on March 24, 2017, he was proceeding under our decision of December 30, 2014, which stated that the decree did not prohibit the use of any particular type of funds for payment of the property settlement.

{¶ 19} As a preliminary point, we note that the trial court held Jay in contempt for including funds that had been awarded to Nancy within Jay's calculation of what payments were due for the property settlement. *See* Doc. #220, p. 4. Specifically, the court stated that "Defendant's assets awarded in the Final Decree that are included in Plaintiff's payments total $17,997.73 of the Plaintiff's calculations in his March 7, 2014 letter and do not include the 3% simple interest. The Court finds the Plaintiff is in willful contempt on this branch of Defendant's March 16, 2016 motion * * *." *Id.*

{¶ 20} In reaching its decision, the court commented that marital assets including

Nancy's "checking and savings account, in the amount of $2,000; and her cash in the amount of $5,000, her Pershing account in the amount of $170.54, and [her] Transamerica Life Insurance policy, with a cash value of $10,827," had been "clearly awarded solely" to Nancy in the final decree. *Id.* at pp. 2-3. This is contrary to Jay's assertion that the property in question, like Nancy's checking and savings accounts, were awarded to him in the divorce decree.

{¶ 21} The court further stated that Jay's calculation of the amount due (Plaintiff's Ex. 68) was less credible than Nancy's accounting of payments. In this regard, the court commented that Jay's amortization schedule (Ex. 68) clearly deducted the amounts Nancy was awarded in the final decree from the $976,358 loan. However, Nancy's Ex. BB used exact figures and did not include the assets awarded to Nancy in the final decree. The court, therefore, found that Nancy's Ex. BB was the more credible accounting. *See* Doc. #220 at pp. 3-4.

{¶ 22} As a result, the court excluded the assets awarded to Nancy from any portion of the payments that Jay owed to Nancy. In addition, the court noted that if these assets were eliminated, along with a $25,000 HSA account, Jay had paid Nancy $465,106.49 on the loan principal as of March 25, 2014. However, under the terms of the decree, Jay should have paid Nancy $488,179 as of March 25, 2014. Furthermore, the court also found that the $465,109.49 in actual payments did not include the 3% simple interest that was also due. *Id.* at p. 4.

{¶ 23} "Contempt is defined in general terms as disobedience of a court order." *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 554, 740 N.E.2d 265 (2001). "Civil contempt sanctions are designed for remedial or coercive purposes and are often

employed to compel obedience to a court order. * * * Thus, civil contempts are characterized as violations against the party for whose benefit the order was made * * *." (Citations omitted.) *Id.* at 554-555.

**{¶ 24}** "A prima facie case of contempt is made by establishing a prior court order and a violation of its terms," and contempt findings "must be supported by clear and convincing evidence." (Citations omitted.) *Martin v. Martin*, 179 Ohio App.3d 805, 2008-Ohio-6336, 903 N.E.2d 1243, ¶ 24 (2d Dist.). After the moving party proves a violation, the nonmovant bears the burden of establishing a defense for noncompliance. We then review the contempt order for an abuse of discretion. (Citations omitted.) *Schutz v. Schutz*, 2017-Ohio-695, 85 N.E.3d 481, ¶ 52 (2d Dist.).

**{¶ 25}** The divorce decree, which was filed on November 25, 2013, provided that Jay would retain various parcels of real property, including Maple Groves, LLC (which consisted of Maple Grove Estates I, II, III, IV, and V), Grand Lakes (which included five properties), and Cobblegate. The decree noted that Nancy had been paid $200,000 for her equity in Grand Lakes.

**{¶ 26}** With respect to retirement accounts, the decree further noted that the parties had various retirement accounts which would be divided. Jay was given his traditional IRA, Pershing No. XXX8551, and his Simple IRA, Pershing No. XXX9880; Nancy received her IRA, Pershing No. XXX8536. The decree also stated that "[t]he parties agree that the value of these retirement accounts has been taken into account in the Property Settlement Paragraph, set forth herein." Doc. #31, p. 10.

**{¶ 27}** Concerning financial accounts, the decree stated that:

The parties represent that they have various financial accounts with

Schwab, Pershing, JP Morgan, Transamerica, Nationwide Life, and Fifth Third Bank. The Plaintiff shall retain his Pershing Advisors account, his Charles Schwab account, and his J.P. Morgan account. The Defendant shall retain her Pershing Advisors account. Additionally, each party shall retain their individual checking and savings accounts presently in their individual names. The division of the various investment accounts has been taken into consideration in the Property Settlement paragraph set forth herein.

The parties further agree that all joint accounts have been closed.

Doc. #31, p. 10. Jay also retained his business interests, including entities like Buckingham & Company, LLC, Buckingham Capital Management, Buckingham Financial Group, Buckingham Tax Services, Inc. dba Weston & Company, National Tax CR Fund, and several others.

{¶ 28} Under the "Property Settlement Payments" clause, the decree provided that:

The parties agree that the Defendant shall receive the sum of $1,200,000.00 as property settlement in this case. This sum shall be paid at the statutory interest rate of 3% per annum, simple interest. The parties agree that $223,642.50 has been paid previously to the Defendant in this case. The remaining balance of $976,358.00 shall be paid in 4 equal payments plus the 3% interest at the same time each year. The first year's payment shall be made within 90 days of the filing of the Final Judgment and Decree of Divorce in the amount of $244,089.50 plus 3% simple interest

from the time of the filing of the Final Judgment and Decree of Divorce until the first payment has been made. The remaining balance shall then be paid in the same three (3) equal installments of $244,089.60 plus simple interest over the next 3 years on the same date as the first payment was made by the Plaintiff. The parties agree that Plaintiff shall be entitled to pay ahead of schedule if he chooses.

The property settlement payment due and owing to the Defendant shall be secured by Promissory Note which shall be signed by the Plaintiff to the Defendant. The Plaintiff shall sign the promissory note to secure the Defendant's property settlement payment upon presentation of same by the Defendant.

Both parties shall sign whatever additional documents are necessary to complete the transfer of the property settlement funds to the Defendant by the Plaintiff. Counsel for the Plaintiff shall prepare the necessary orders in the event that qualified funds from retirement accounts are used. The parties agree that the funds are a division of property incident to a divorce and a non-taxable event pursuant to I.R.S. Code Section 408(d)(6) and I.R.S. Code Section 71(b)(2)(a).

The parties specifically agree that this property settlement payment set forth herein is non-dischargeable in bankruptcy and shall be considered a domestic support obligation.

Doc. #31 at pp. 12-13.

{¶ 29} When the decree was filed, the balance left remaining on the property

settlement was $976,358.50. On December 9, 2013, Jay's attorney, Kent Depoorter, sent three proposed QDROs to Nancy's attorney, Ann Crossman. The QDROs related to three accounts: Jay's Pershing IRA No. XXX8551; Jay's Pershing Simple IRA No. 9880; and Jay's Fifth Third HSA No. XXXXXX0498.[1] The proposed orders pertaining to these accounts stated that "this Order shall be a Qualified Domestic Relations Order (hereinafter referred to as a 'QDRO' as defined in section 206(d)(3) of the Employee Retirement Income Security Act of 1974 ('ERISA') and section 414(p) of the Internal Revenue Code of 1986 * * *." Defendant's Ex. Q, Bates Stamp 00266, 00272, and 00277.

{¶ 30} Crossman responded on December 10, 2013, stating that "Individual Retirement Accounts are not governed by ERISA laws and, therefore, Qualified Domestic Relations Orders do not apply. Please forward to me the correct documents dividing the Individual Retirement Accounts." Plaintiff's Ex. 2, p. 1.

{¶ 31} Rather than responding or forwarding any documents, Depoorter sent Pershing a letter on December 13, 2013 asking Pershing to transfer 100% of Jay's accounts (XXX8551 and XXX9880) to Nancy's Pershing Account No. XXX8536. *See* Plaintiff's Ex. 3. Jay also signed "asset movement authorization" forms on December 17, 2013. Plaintiff's Ex. 25. Based on these documents, Pershing transferred $167,058.54 from Jay's Simple IRA (XXX9880) into Nancy's IRA account on December 18, 2013, and $142,062.04 from Jay's IRA (XXX8551) into Nancy's Pershing IRA account on December 23, 2013. On Nancy's Pershing statement, these transfers were reflected as QDRO transfers. *See* Defendant's Ex. B, Bates Stamp 00014-00015. As was noted,

---

[1] The decree did not identify or discuss any HSA accounts.

Jay's notice of appeal was also filed on December 23, 2013. Based on the timing of the payments and the content of the divorce decree, the next payment of the property settlement would be due on December 18, 2014, and the remaining payments would be due on December 18th of each year thereafter, until the payments were completed.

{¶ 32} On December 24, 2013, Crossman contacted Depoorter about the retirement orders to be prepared, but did not receive a response. *See* Plaintiff's Ex. 4. Nancy first learned about the transfer of funds when she received her Pershing statement in January 2014. She contacted Pershing to request a reversal of the transfer because it had been done without her authorization and Pershing was the custodian of her account. However, Pershing refused. Pershing also refused to provide her with documentation because the transfer had been made from Jay's account; Nancy was finally able to obtain documents in February 2015, after issuing a subpoena to Pershing.

{¶ 33} After December 9, 2013, Jay's counsel did not prepare and send any further orders for transfers of funds to Nancy. On January 9, 2014, Crossman sent a promissory note to Depoorter. Depoorter replied on January 14, 2014, and in the letter, provided his accounting of items that Jay intended to include as payments to Nancy in satisfaction of the $976,358 settlement. Plaintiff's Ex. 4. At the contempt hearing, Nancy testified that Jay had improperly claimed credit against the property settlement for a life insurance policy that she had owned since its inception, as well as other accounts that belonged to her. On January 23, 2014, Crossman informed Depoorter of the fact that Jay was not entitled to use Nancy's money to pay the property settlement. *See* Defendant's Ex. T, Bates Stamp 00290.

{¶ 34} However, Depoorter continued to insist that such items should be included.

For example, in a letter of March 20, 2014, Depoorter stated that the following amounts, among others, were "payments" that had been made to Nancy: a Transamerica life insurance policy (that was titled in Nancy's name) in the amount of $10,827.19; "Nancy's checking and savings accounts" in the amount of $2,000; "Nancy's cash" in the amount of $5,000; and "Nancy's Pershing account as of 6/30/2011" in the amount of $170.54. Defendant's Ex. U, Bates Stamp 00296-00297. Depoorter made the same claims again in a March 27, 2014 letter to Crossman. Defendant's Ex. V, Bates stamp 00314-00315.

{¶ 35} According to Depoorter's assertions in these letters, Jay had paid Nancy a total of $512,191.89 by March 27, 2014. This amount included the above accounts and cash that Nancy owned, a $25,000 HSA account that was not transferred to Nancy and was in dispute; the money transferred from Jay's IRAs in December 2013, and a $160,000 check that was paid on February 24, 2014.

{¶ 36} At the hearing on June 9, 2016, Jay presented Plaintiff's Ex. 68, which was an amortization schedule prepared by his CPA. This schedule listed the payment balance as of November 25, 2013 (the date of the decree) at $935,360, after deducting Nancy's life insurance, Nancy's cash, and Nancy's Pershing account. Thus, even in June 2016, Jay was still contending that he should be credited with assets that belonged to Nancy. Furthermore, Jay never provided any reason or testimony at the contempt hearings to show why these amounts should be appropriately credited against money he was required to pay. As a result, Jay failed to meet his burden to show that that he had a defense to contempt. *See Schutz*, 2017-Ohio-695, 85 N.E.3d 481, at ¶ 52.

{¶ 37} Furthermore, Jay incorrectly asserts in his brief that until the trial court issued its contempt rulings on March 24, 2017, he was properly proceeding under our

decision of December 30, 2014. When Jay attempted to pay using the HSA in December 2013 and in early 2014, our decision had not yet been made. In addition, by the time of the June 9, 2016 hearing, when Jay was still arguing that he was entitled to be credited with Nancy's cash and savings accounts, we had long ago held that the trial court did not abuse "its discretion in concluding that the agreed entry submitted by Mrs. Buckingham accurately reflected the parties' agreement and that the parties intended to keep the accounts in their own names." *Buckingham*, 2d Dist. Greene No. 2013-CA-77, 2014-Ohio-5798, at ¶ 22. We further commented that "[m]oreover, insofar as the parties' retention of their own accounts, according to the final judgment, was factored into the property settlement, any adjustment to the distribution of these accounts would necessitate a corresponding adjustment of the property settlement." *Id.* Thus, there was no credible basis for asserting that in paying the property settlement, Jay should be credited with the amounts listed in Ex. 68 as Nancy's cash, Nancy's Pershing account, and Nancy's life insurance.

{¶ 38} Moreover, the divorce decree required Jay's attorney to draft any orders that were needed. There was no dispute that after Depoorter sent proposed QDROs to Nancy's attorney in December 2013, Depoorter never thereafter submitted any additional documents. Thus, Jay's contention that he "paid" Nancy $25,000 in additional HSA funds, or even that he should be credited with attempting to pay her this amount, is without merit. The trial court also commented, in refusing to find Nancy in contempt for failing to set up a HSA account, that the decree did not require her to set up financial accounts into which Jay could transfer funds. In this regard, the trial court commented that Jay "may have avoided the lengthy hearing by cashing out the [HSA], if possible, and using the

cash to pay the property settlement. He again, unilaterally decided not to do so." Doc. #220 at p. 16.

{¶ 39} Accordingly, we find no abuse of discretion in the trial court's finding that Jay was in contempt for failing to pay the first two years of payments as specified in the decree. An offer to pay is not payment, and there is no dispute that Jay did not transfer funds to Nancy as specified in the divorce decree. As shown in Defendant's Ex. BB, by December 18, 2014, Jay had transferred only $465,812.87 to Nancy, when the terms of the decree required that he have transferred $488,197, plus 3% simple interest, by that date. For the same reasons, the court's order was not against the manifest weight of the evidence.

{¶ 40} In a manifest weight challenge, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the [judgment].' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *Accord Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17 (applying *Thompkins* to civil cases).

{¶ 41} Trial courts resolve witness credibility and the weight to be accorded to the testimony. (Citation omitted.) *Jenkins v. Jenkins*, 2012-Ohio-4182, 975 N.E.2d 1060, ¶ 18 (2d Dist.). "Because the factfinder, be it the jury or, as in this case, the trial judge,

has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

**{¶ 42}** We have carefully reviewed the record and conclude that this is not the exceptional case in which the evidence weighs heavily against the trial court's judgment. To the contrary, we agree with the trial court that Jay's assertion of amounts he was entitled to offset was not credible.

**{¶ 43}** Accordingly, Jay's First Assignment of Error is overruled.

## III. Treatment of HSA

**{¶ 44}** Jay's Second Assignment of Error states that:

The Trial Court Abused Its Discretion and Its Findings Were Against the Manifest Weight of the Evidence in Finding That Appellant Cannot Use His HSA (Health Savings Account) to Pay the Property Settlement and Places Restrictions on the Use of Said Funds.

**{¶ 45}** Under this assignment of error, Jay contends that the trial court abused its discretion by finding that Jay could not use HSA funds to pay the property settlement. Jay's reasoning is based on the fact that the trial court stated during the transcript that there was no restriction on the funds that could be used to pay the property settlement,

but ruled to the contrary in its judgment entry by finding that Jay could not use HSA funds to pay. In addition, Jay cites various statements of experts who testified that transfers of HSA funds under divorce decrees have no tax consequences on transfer.

**{¶ 46}** The contempt motions were heard by the trial court, and the court made numerous comments throughout the hearings, some of which were not consistent with each other. However, it is well-settled that courts speak only through their journal entries. *Economy Fire & Cas. Co. v. Craft Gen. Contrs., Inc.*, 7 Ohio App.3d 335, 336, 455 N.E.2d 1037 (10th Dist.1982), citing *Andrews v. Bd. of Liquor Control,* 164 Ohio St. 275, 131 N.E.2d 390 (1955), paragraph three of the syllabus. Thus, judges can change their minds "before making a journal entry without giving the parties grounds for an appeal, because the court has not spoken until its journal entry is filed." (Citation omitted.) *Id. Accord Smith v. Smith*, 2d Dist. Clark No. 2087, 1986 WL 1698, *3 (Feb. 10, 1986).

**{¶ 47}** Until the judgment is finalized, courts have " 'inherent power to reconsider any matter.' " *State v. Nelson*, 10th Dist. Franklin No. 14AP-229, 2014-Ohio-5757, ¶ 23, quoting *C.C.M. Enterprises, Inc. v. U.S. Fire Ins. Co.*, 1st Dist. No. C-870193, 1988 WL 26226 (Mar. 2, 1988). *See also In re D.M.*, 2d Dist. Champaign No. 09CA48, 2011-Ohio-123, ¶ 14 (judge's oral statements have no legal force and effect when not journalized); *In re Adoption of Gibson*, 23 Ohio St.3d 170, 173, 492 N.E.2d 146 (1986), fn.3 (stating that because a court speaks only through its journal, "commentary from the bench, leading up to pronouncement of a decision," is not "adequate to provide a disappointed party a solid basis on which to ground an appeal").

**{¶ 48}** There is no doubt that this was a complicated case. We note that even the

experts that Jay presented contradicted each other regarding HSAs. For example, Alissa Culp, a third-party administrator for tax-free accounts, stated that an individual does not have to be on a high-deductible plan to open a HSA account. Transcript of August 8, 2016 Hearing, p. 32. In contrast, David Whaley, an ERISA and employee benefits attorney, stated that a HSA is an account that is dependent on having a high-deductible health care plan, and an individual is allowed to set up a special account for health-care coverage when he or she has a high-deductible plan and no other disqualifying coverage. *Id.* at pp. 48-49.

{¶ 49} Throughout the course of the hearings, an issue was the interpretation of our prior opinion, which briefly discussed Jay's contention on appeal that "the terms of the property settlement upon which the parties had agreed called for him to pay Mrs. Buckingham $1.2 million from qualified or non-qualified sources, but that the final entry "limited [him] to the use of cash or qualified funds from retirement accounts" for the payment of this obligation." *Buckingham*, 2d Dist. Greene No. 2013-CA-77, 2014-Ohio-5798, at ¶ 17.

{¶ 50} Our entire consideration of this point was limited to one paragraph, in which we said that we found no language in the decree imposing the limitation that Jay advocated. We noted that the only reference to funds "in the section related to the property settlement states that Mr. Buckingham's attorney 'shall prepare the necessary orders *in the event* that qualified funds from retirement accounts are used.' " (Emphasis sic.) *Id.* at ¶ 18. We concluded that "[t]his language does not require or prohibit the use of any particular type of funds for the payment of the property settlement and even implicitly approves the usage of qualified funds." *Id.*

{¶ 51} Notably, we did not define "qualified funds," nor did we have occasion to consider whether the use of any particular method of payment was consistent with the intent of the property settlement, because no payments had been made at the time of the appeal. As a result, that issue was not before us, and our comments, in that respect, were dicta.

{¶ 52} In its decision, the trial court concluded that HSAs are not retirement funds, and that nothing in the decree gave Jay authority to pay Nancy "her share of the property settlement in any form which would result in any further limitation or costs incurred by her when she uses the funds except the tax consequences of her use of the qualified funds." Doc. #220 at p. 15. The court, therefore, held that Nancy was not under any obligation to accept HSA funds and that Jay was required to exclude his HSA account from the payment of the property settlement. *Id.*

{¶ 53} "Ohio law clearly establishes that a judgment may be interpreted if it is ambiguous. If there is good faith confusion over the interpretation to be given to a particular clause of a divorce decree, the trial court in enforcing that decree has the power to hear the matter, clarify the confusion, and resolve the dispute." (Citations omitted.) *Quisenberry v. Quisenberry*, 91 Ohio App. 3d 341, 348, 632 N.E.2d 916 (2d Dist.1993). *Accord Landry v. Landry*, 2017-Ohio-564, 85 N.E.3d 313, ¶ 7 (2d Dist.). The trial court is to consider the equities involved in determining the prior intent of the decree. (Citations omitted.) *Rubin v. Rubin*, 11th Dist. Trumbull No. 2005-T-0016, 2006-Ohio-2383, ¶ 27; *Makar v. Makar*, 7th Dist. Mahoning No. 02 CA 37, 2003-Ohio-1071, ¶ 12. *See also Hale v. Hale*, 2d Dist. Montgomery No. 21402, 2007-Ohio-867, ¶ 15 ("the court must, in interpreting an ambiguous property division, consider both the equities involved

and the law in determining the intent").

{¶ 54} "An interpretative decision by the trial court cannot be disturbed upon appeal absent a showing of an abuse of discretion." *In re Marriage of Seders*, 42 Ohio App.3d 155, 156, 536 N.E.2d 1190 (9th Dist.1987), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). As we have often said, an abuse of discretion " 'has been defined as an attitude that is unreasonable, arbitrary, or unconscionable.' " *Mossing-Landers v. Landers*, 2016-Ohio-7625, 73 N.E.3d 1060, ¶ 21 (2d Dist.), quoting *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). We have also repeatedly stressed, in following *AAAA Enterprises*, that " 'most instances of abuse of discretion will result in decisions that are simply unreasonable,' " and that decisions are unreasonable if they are unsupported by a sound reasoning process. *Id. See also*, *e.g.*, *Myers v. Brewer*, 2017-Ohio-4324, 91 N.E.3d 1249, ¶ 12 (2d Dist.).

{¶ 55} We agree with the trial court's conclusion that nothing in the decree permits Jay to limit Nancy's use of the property settlement in the manner that a HSA would involve. "HSAs are creations of the Internal Revenue Code and were authorized by Congress in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. *See* Pub. L. 108-173, § 1201, 117 Stat. 2066, 2469-79 (2003). * * * Essentially, HSAs encourage individuals who have high deductibles in their health insurance plans to save for their healthcare costs by providing tax-preferred treatment for such savings. *See* 26 USC § 223 (a). Disbursements from a HSA for anything other than qualified medical expenses generally are taxable as gross income and at an additional rate of 20%. *See* 26 USC § 223 (f) (4) (A)." (Footnotes omitted.) *Mooney v. Webster*, 300 Ga. 283,

286-87, and 291, 794 S.E.2d 31 (2016) (agreeing with the federal district court that HSAs are different from IRAs because "a HSA is not a substitute for wages * * *").

**{¶ 56}** The federal district court decision that the Supreme Court of Georgia referenced was *In re Mooney*, 503 B.R. 916 (Bankr. M.D. Ga.2014). In that case, the federal district court had noted that while "[b]oth HSAs and IRAs are tax-favored savings accounts with penalties for nonqualified withdrawals," a HSA differs from an IRA in significant ways, including the fact that, unlike an IRA, a HSA is not "a substitute for wages after an individual retires," but functions "as a means to save for and to pay medical expenses without regard to the income needs of the account owner * * *." *Id.* at 922, citing *Rousey v. Jacoway*, 544 U.S. 320, 329-330, 125 S.Ct. 1561, 161 L.Ed.2d 563 (2005). The Eleventh Circuit Court of Appeals subsequently certified questions to the Supreme Court of Georgia, and that is how the Supreme Court of Georgia came to consider the case. *See In re Mooney*, 812 F.3d 1276 (11th Cir.2016). *See also In re Gardner*, No. 12-12485 HRT, 2013 WL 3804594, *4 (Bankr. D.Colo., July 19, 2013) (rejecting debtor's claim for exemption of HSA funds, stating that it "cannot stretch the definition of 'pension or retirement plan or deferred compensation plan' to embrace the funds held in an HSA").

**{¶ 57}** The trial court, thus, correctly concluded that Jay's HSA was not a retirement account. Although 26 U.S.C. 223(f)(4)(C) removes the 20% penalty for persons who are eligible for Medicare, that does not change the conclusion that the funds in the HSA were not qualified funds in a retirement account. The HSA funds, therefore, were not within the contemplation of how funds could be transferred. Specifically, the decree does not evidence an intent to restrict Nancy's use of the property settlement in

this manner.

**{¶ 58}** Even if this were otherwise, we disagree, in part, with the trial court's conclusion that Nancy's use of her property settlement could be limited by the requirement that she pay the tax consequences of having received qualified funds. In this regard, the court stated that it "additionally finds that nothing in the divorce decree gives the Plaintiff the authority to pay the Defendant her share of the property settlement in any form which would result in any further limitations or costs incurred by her when she uses the funds except the tax consequence of her use of the qualified funds." Doc. # 220 at p. 15. To the extent that the court's statement can be read to include payments made through Jay's retirement or qualified funds that were accumulated after the divorce, it is inconsistent with the intent surrounding the division of the marital property.

**{¶ 59}** "Marital property is statutorily considered to be owned equally by both spouses," and an equal split "is presumed most equitable." *Young v. Young*, 2d Dist. Clark No. 08-CA-59, 2009-Ohio-3504, ¶ 3, citing R.C. 3105.171(C)(1) and (2). Additionally, "retirement benefits earned during marriage generally are divisible as marital property." (Citations omitted.) *Id.* at ¶ 31.

**{¶ 60}** As was noted above, the parties' retirement funds were considered in conjunction with all the assets in reaching the property settlement. *See* Doc. #31 at p. 10. However, the only pension or retirement funds Jay had at the time of the divorce were the ones listed in the decree – his Pershing traditional and Simple IRAs. *See* Transcript of June 10, 2016 Hearing, Testimony of Jay Buckingham, p. 302 (indicating he had disclosed all his assets and liabilities at the time of the divorce and that he did not

then have a 401(k) account).[2]    However, Jay later asked to transfer numerous after-acquired retirement or other qualified funds, including the following: (1) $25,000 from Jay's HSA (the HSA previously discussed that was the subject of a proposed QDRO on December 9, 2013); (2) $50,000 from Jay's Simple IRA (January 15, 2015); (3) $15,000 from Jay's Simple IRA (May 4, 2015); (5) $10,000 from Jay's HSA on May 5, 2015, which was increased by another $5,000 on July 31, 2015; and (6) $75,000 from Jay's IRA on July 31, 2015.   *See* Defendant's Ex. RR, Bates Stamp 000601; Plaintiff's Ex. 60.

{¶ 61} In a letter dated July 31, 2015, Jay's attorney indicated that Jay would not calculate interest on these funds from that date forward because he had tried to transfer the funds to Nancy.   *Id.* at Defendant's Ex. RR, Bates Stamp 000601.   In addition, Jay filed a motion for contempt against Nancy on October 29, 2015, based on her refusal to accept the above after-acquired funds.   *Id.* at Plaintiff's Ex. 60 (September 2, 2015 Depoorter letter to Crossman, enclosing motion for contempt).   *See also* Doc. #113 (contempt motion filed on October 29, 2015).

{¶ 62} Jay's Pershing IRA and Simple IRA accounts were clearly the funds contemplated when the parties agreed that "Counsel for the Plaintiff shall prepare the necessary orders in the event that qualified funds from retirement accounts are used." Doc. #31 at p. 13.

{¶ 63} Concerning taxability, the decree states only as follows:

> Both parties shall sign whatever additional documents are necessary

---

[2] Jay indicated that he could not recall if the 401(k) account was created in 2013 or 2014, but the administrator of the fund testified that it was effective January 1, 2014.   Transcript of August 8, 2016 Hearing, p. 7. *See also* Transcript of June 10, 2016 Hearing, pp. 303-304 and Ex. SS, Bates Stamp 000628 (indicating that the 401(k) account for Jay was created on February 18, 2014).

to complete the transfer of funds to the Defendant by the Plaintiff.   Counsel for the Plaintiff shall prepare the necessary orders in the event that qualified funds from retirement accounts are used.   The parties agree that the funds are a division of property incident to a divorce and a non-taxable event pursuant to I.R.S. Code Section 408(d)(6) and I.R.S. Code Section 71(b)(2)(a).

Doc. # 31, p. 13.

**{¶ 64}** The decree thus indicated that the transfer of funds would be nontaxable, but did not address the taxability of funds after they were transferred.   We conclude that, with the exception of the retirement funds in existence on the date of the order, any other funds transferred to Nancy, including funds in Jay's HSAs, could not be done in a way that would be taxable to her.   As was noted, this was not an issue raised or considered in the prior appeal.

**{¶ 65}** R.C. 3105.171(A)(3)(a) defines "marital property" as:

(i) All real and personal property that *currently is owned* by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(iii) Except as otherwise provided in this section, all income and

appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage * * *.

(Emphasis added.)

**{¶ 66}** "In any divorce action, the starting point for a trial court's analysis is an equal division of marital property." (Citation omitted.) *Daniel v. Daniel*, 139 Ohio St.3d 275, 2014-Ohio-1161, 11 N.E.3d 1119, ¶ 7. It is axiomatic that an equal division of marital property "is presumed to be equitable." *Fisher v. Fisher*, 2d Dist. Darke No. 2014-CA-6, 2015-Ohio-786, ¶ 6; *Young*, 2d Dist. Clark No. 08-CA-59, 2009-Ohio-3504, at ¶ 3. If Nancy were required to pay taxes on the property settlement funds distributed to her, other than the retirement funds mentioned in the decree, that would cause her to receive less than an equitable or equal amount of marital assets. *See Caudill v. Everett*, 3d Dist. Union No. 14-92-40, 1993 WL 169158, *2 (May 10, 1993) (refusing to interpret decree to contravene obvious intent of parties, who agreed that marital debts would be equitably divided). *See also Hale*, 2d Dist. Montgomery No. 21402, 2007-Ohio-867, at ¶ 15 (in interpreting ambiguity in property division, courts consider equities and law to decide intent); *Hocker v. Hocker*, 188 Ohio App.3d 755, 2010-Ohio-2835, 936 N.E.2d 1003, ¶ 24 and 65 (2d Dist.) (in construing ambiguous divorce agreement read into record, the intent of the parties and the equities involved are considered).

**{¶ 67}** In *Hocker*, we concluded that the trial court erred in refusing to allow a party's attorney to testify about the parties' motives during their negotiations to clarify an ambiguity in the agreed decree; however, we found that the error was harmless because the court did consider the proffer of the attorney's testimony. *Id*. at ¶ 42. Notably, in the

case before us, neither side attempted to present evidence from their attorneys as to negotiations.

**{¶ 68}** Nancy's tax expert, J.R. Hochwalt, testified that Nancy is in a 33% federal tax bracket and a 4.9% state tax bracket. Assuming that all of the $976,358 property settlement (excluding interest) were paid in funds that required Nancy to pay tax when she accessed the funds, and also assuming that Nancy's tax rate remained the same, she would potentially pay around $370,039, or more than one-third of the property settlement when she accessed the funds.[3] This would be significantly less than an equal or equitable division of the marital property. It is also not speculative that Nancy would have to withdraw retirement funds, since she was 65 years old at the time of the 2016 hearings, and had no income other than her spousal support (which would end in the summer of 2017) and $800 per month in social security benefits.[4] Even assuming that Nancy might be in a lower tax bracket in later withdrawing the funds, she would still receive less than her equal share of the marital property.

**{¶ 69}** While the decree did contemplate that qualified funds in retirement accounts could be transferred, the only logical way to interpret that is that the parties contemplated

---

[3] This is consistent with the trial court's observations a number of times during the hearings that the difference in who was responsible for paying tax was about $400,000. The court did not make a specific finding on this point, as the court concluded that it was bound by our prior decision. Doc. #220 at p. 15. However, as has been noted, we had no reason to consider this issue, as no payments had been made prior to the time Jay appealed from the original judgment of divorce.

[4] In addition, Nancy had already been subjected to IRS excise penalties concerning the overfunding of her Pershing IRA in December 2013. Although Nancy self-reported the issue to the IRS, which then assessed penalties, she did so on the advice of her tax expert, who concluded that her Pershing IRA had been improperly overfunded. He was eventually able to get the penalty amounts refunded, but Nancy did have to pay these amounts in the interim, in addition to expending funds on a tax consultant.

potential taxable consequences for transfer of those retirement funds in existence at the time of the decree. As was noted, the HSA was not a retirement fund and did not fit within this definition. It was also not mentioned in the decree. Thus, the trial court correctly concluded that Jay could not use HSA accounts to pay for the property settlement. The Second Assignment of Error, therefore, is overruled.

IV. Attorney Fees Relating to Promissory Note

{¶ 70} Jay's Third Assignment of Error states that:

The Trial Court Abused Its Discretion and Its Findings Were Against the Manifest Weight of the Evidence in Awarding Attorney Fees for Defendant's Expert, Michael McNamee.

{¶ 71} Under this assignment of error, Jay contends that the trial court erred in awarding $10,000 to Nancy in connection with the testimony of attorney Michael McNamee. Jay contends that McNamee's testimony about promissory notes was irrelevant to any issues in the case, because McNamee testified about a note that was not used.

{¶ 72} Under the provision entitled "Property Settlement Payments," the divorce decree stated as follows:

The property settlement payment due and owing to the Defendant shall be secured by Promissory Note which shall be signed by the Plaintiff to the Defendant. The Plaintiff shall sign the promissory note to secure the Defendant's property settlement payment upon presentation of same by the Defendant.

Doc. # 31 at p. 12.

{¶ 73} The decree did not specify particular wording for the promissory note. On January 23, 2014, Nancy's attorney, Ann Crossman, sent a promissory note to Jay's attorney, Kent Depoorter, and asked him to have Jay sign the note and return it. *See* Defendant's Ex. T. No response was received.

{¶ 74} Instead of discussing the matter or replying to Crossman's letter, Depoorter sent a modified promissory note to Crossman on March 27, 2014, that Jay had signed. *See* Defendant's Ex. V; Plaintiff's Ex. 19. Crossman then sent another promissory note to Depoorter on March 31, 2014, indicating that the promissory note Jay had signed was unacceptable. *See* Plaintiff's Ex. 20.

{¶ 75} Subsequently, on January 28, 2015, Nancy filed a motion for contempt and attorney fees in the trial court, based on several grounds, one of which was that her attorney had presented a promissory note to Jay's counsel and to Jay on several occasions, but Jay had failed to sign the note that was submitted. Instead, Jay's counsel had submitted a modified version of the note that did not contain all the language that the note submitted by Nancy's counsel contained. Nancy asked that the court order Jay to sign the promissory note that she had provided.

{¶ 76} On October 29, 2015, Jay filed a motion for contempt against Nancy, based, among other things, on her alleged failure to prepare a promissory note that was consistent with the terms in the divorce decree. Jay also asked for attorney fees and costs.

{¶ 77} As the trial court noted in its decision, the difference between the two promissory notes was that Nancy's note contained an acceleration clause and Jay's

promissory note did not. While the trial court overruled Nancy's motion for contempt on this issue, the court also commented that Jay should have consulted with the court instead of engaging in self-help. However, the court found that Jay's actions were not willful because there was an arguable defense to not signing Nancy's promissory note. The court also overruled Branch III of Jay's October 29, 2015 contempt motion, which alleged that Nancy failed to prepare a proper promissory note that was consistent with the terms in the divorce decree.

{¶ 78} In later deciding whether to award fees, the court stated that:

Plaintiff [Jay] prepared his own promissory note based on his unilateral decision the Defendant's promissory note contained an acceleration clause that was not mentioned in the Final Decree[,] resulting in delays in resolution of the property settlement. The court finds resolution of the promissory note could have been settled by a simple conference call between the parties and the court. Instead Plaintiff resorted to the self-help practice of having his attorney prepare the note without involving the Court.

Doc. # 220 at p. 11.

{¶ 79} The court further noted that Nancy had been required to respond to Jay's contempt motions as well as ancillary motions to exclude her expert witnesses, that Jay's actions caused Nancy to hire an attorney (Michael McNamee) to advise her on the promissory note, and that the attorney had also testified at trial for a total fee of $10,000. *Id.* The court subsequently awarded Nancy this amount for McNamee's fees. *Id.* at p. 12. Additionally, in overruling the motions in limine that Jay had filed to preclude McNamee's testimony, the trial court noted that the testimony of McNamee and Nancy's

other experts were needed to "break down the complicated financial issues to better understand [Nancy's] contempt defense" and to decide the relevance of the testimony that was presented. *Id.* at p. 5.

{¶ 80} R.C. 3105.73 (B) states that:

In any post-decree motion or proceeding that arises out of an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that motion or proceeding, the court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' income, the conduct of the parties, and any other relevant factors the court deems appropriate, but it may not consider the parties' assets.

{¶ 81} Awards of litigation expenses under R.C. 3105.73 are based on the trial court's sound discretion, and will be reversed only if the court abused its discretion. *See, e.g., Brooks v. Brooks*, 6th Dist. Fulton No. F-11-020, 2013-Ohio-405, ¶ 24. In addition, the parties' conduct "is a relevant factor in determining whether an award of attorney fees is equitable." *Karales v. Karales*, 10th Dist. Franklin No. 05AP-856, 2006-Ohio-2963, ¶ 25.

{¶ 82} Awards under R.C. 3105.73 are not contingent on a finding of contempt, nor are they limited just to attorney fees. Instead, litigation expenses are included, which encompass expert fees. *Brooks* at ¶ 24 (affirming award for litigation expense for expert on QDROs). *See also O'Malley v. O'Malley*, 8th Dist. Cuyahoga No. 98708, 2013-Ohio-5238, ¶ 87 ("Guardian ad litem fees, expert fees, and attorney fees are 'litigation

expenses' under R.C. 3105.73"); *Moore v. Moore*, 175 Ohio App.3d 1, 2008-Ohio-255, 884 N.E.2d 1113, ¶ 92 (6th Dist.) (size and potential value of marital estate warranted employment of several experts); *Wilson v. Wilson*, 9th Dist. Wayne No. 05CA0078, 2008-Ohio-3195, ¶ 12-14; *Panico v. Panico*, 10th Dist. Franklin No. 06AP-376, 2006-Ohio-6650, ¶ 17 (expert witness fees may be allocated to opposing party under R.C. 3105.73).

**{¶ 83}** We have reviewed the entirety of the proceedings, and we disagree with Jay's contention that McNamee's testimony was irrelevant. Notably, Jay filed a motion for contempt against Nancy, alleging that she failed to prepare a proper promissory note. Nancy was entitled to defend herself against the contempt allegations.

**{¶ 84}** In addition to being a lawyer, McNamee had a master's degree in business administration with an emphasis in accounting. Transcript of March 15, 2016 Hearing, pp. 121-122. His area of practice included business work, any type of transactional work, and complex commercial litigation. *Id.* at pp. 122-123. McNamee testified that he had prepared hundreds of promissory notes and had litigated issues concerning promissory notes. *Id.* at pp. 123. He reviewed both the note that Jay signed and the one that Nancy submitted, as well as the final divorce decree. *Id.* at pp. 123-124. With specific respect to the contempt motion that Jay filed, McNamee testified that the promissory note that Nancy proposed was appropriate, that acceleration clauses were "usual and customary," and that the note Jay had prepared and signed was one of the few he had seen that did not contain an acceleration clause. *Id.* at 128-130. He further stated that acceleration clauses are found in 99.99% of promissory notes. *Id.* at p. 142.

**{¶ 85}** Jay has not challenged the reasonableness of the amount awarded for McNamee's work, nor has he challenged the court's findings on the fact that Nancy was

the economically disadvantaged party; instead, he has simply contended that McNamee's testimony was irrelevant. As noted, we disagree. We also note that McNamee testified about the issue of whether the promissory note's restriction of payment to lawful U.S. money restricted or modified the divorce decree. This was an issue the parties raised. Furthermore, from the trial court's decision, it is clear that the court disapproved of Jay's actions even though the court limited its contempt findings to one issue. The record is well-supported in this regard.

{¶ 86} Accordingly, we conclude that the trial court did not abuse its discretion in awarding fees for McNamee's testimony. The Third Assignment of Error, therefore, is overruled.

V. Expert Attorney Fees for David Suich

{¶ 87} Jay's Fourth Assignment of Error states as follows:

The Trial Court Abused Its Discretion and Its Findings Were Against the Manifest Weight of the Evidence in Awarding Attorney Fees for Defendant's Expert, David Suich.

{¶ 88} Under this assignment of error, Jay contends that the trial court abused its discretion in awarding fees to David Suich. Jay apparently contends that Suich's testimony was unnecessary, as he allegedly testified to issues settled by our prior opinion. In addition, Jay argues that no one testified that Suich's fees were necessary and reasonable.

{¶ 89} As a preliminary matter, we disagree with this characterization of Suich's testimony. We have reviewed the entire record, and, as the trial court noted, Suich's

testimony aided in understanding the issues.   Suich was an attorney who practices tax and business law and also does probate work.   He indicated that his practice addresses issues related to ERISA, and that he was retained to address tax issues related to 401(k)s, IRAs, and ERISA.   His testimony pertained to these matters, as did the testimony of several experts that Jay called as witnesses.

{¶ 90} The trial court awarded Nancy $1,250 in fees for Suich's testimony. As noted, in overruling Jay's motion in limine, the court stated that the testimony of Suich, McNamee, and another expert (Hochwalt) retained by Nancy "was needed to break down the complicated financial issues so that the Court could better understand the Defendant's contempt defense.   The testimony was also needed to determine the relevance of evidence presented."   Doc. #220 at p. 5.

{¶ 91} As we said, the trial court has "sound discretion" over awards of litigation expenses under R.C. 3105.73.   *Brooks*, 6th Dist. Fulton No. F-11-020, 2013-Ohio-405, at ¶ 24.   The statute itself does not contain any particular standards for deciding the appropriateness of "litigation fees" other than stating that "the court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable."

{¶ 92} In its decision, the court stated that Suich had billed $1,250 in fees.   This figure appears to have been derived from Defendant's Ex. QQQ, which shows $1,250 in billings for Suich for December 2015.   This exhibit was not identified at trial, but was transmitted to our court, along with all other exhibits of the parties.   We obviously cannot consider it as evidence.

{¶ 93} Suich did not claim a specific amount of fees, but Nancy indicated that she

had paid McNamee's office, including Suich, more than $10,000, and had not yet received a final bill. *See* Transcript of March 15, 2016 Hearing, pp. 190-191. Suich had initially testified at a hearing on December 15, 2015, and returned again on June 10, 2016, to testify as a rebuttal witness. Clearly, after Nancy testified on March 15, 2016, additional fees were incurred for Suich's testimony.

**{¶ 94}** Given that Suich testified at two different hearings and that the billing statements of Nancy's attorney for 2015 and 2016 contain numerous entries for telephone conferences and consultations with Suich, it is likely that his fees significantly exceeded $1,250. *See* Defendant's Exs. OOO, PPP, and EEEE.

**{¶ 95}** Nonetheless, since Ex. QQQ was not identified, the trial court could not simply pick a number, nor can we. Accordingly, Jay's assignment of error has merit, and the judgment will be modified to eliminate the $1,250 award for Suich's fees. Based on the preceding discussion, the Fourth Assignment of Error is sustained.

VI. Ruling on Contempt Motion Filed Against Nancy

**{¶ 96}** Jay's Fifth Assignment of Error states that:

The Trial Court Abused Its Discretion and Its Findings Were Against the Manifest Weight of the Evidence in Failing to Find the Defendant in Contempt of Court for Failing to Accept Monies Paid and Offered To Be Paid to Defendant by Plaintiff.

**{¶ 97}** Under this assignment of error, Jay contends that the trial court erred in failing to find that Nancy was in contempt because she did not accept the following funds from Jay: (1) the $25,000 in HSA money; (2) $50,000 in IRA money; (3) $15,000 in HSA

money; (4) IRA funds of $15,000; and (5) $75,000 in 401(k) money. In response, Nancy argues that the issue of what funds could be accepted has been a main point of contention throughout the proceedings, and that Jay is not permitted to create new qualified funds that were not in existence at the time of the decree. As was noted in our discussion of the Third Assignment of Error, we agree with this point.

{¶ 98} Contempt orders are reviewed for abuse of discretion. *Schutz*, 2017-Ohio-695, 85 N.E.3d 481, at ¶ 52. Based on our prior discussion, the trial court did not act unreasonably, arbitrarily, or unconscionably in refusing to find Nancy in contempt for failing to accept the above accounts, which were not mentioned in the decree, and/or were generated after the divorce decree was filed. As was noted, we did not, and could not, have considered this point in our prior opinion, because no payments had yet been made.

{¶ 99} Accordingly, the Fifth Assignment of Error is overruled.

## VII.   Attorney Fees Awarded to Defendant

{¶ 100} Jay's Sixth Assignment of Error states as follows:

> The Trial Court Abused Its Discretion and Its Findings Were Against the Manifest Weight of the Evidence in Awarding Attorney Fees to Defendant's Attorney in the Amount of $55,000.

{¶ 101} This assignment of error involves two separate fee awards. The trial court awarded Nancy $15,000 for attorney fees she incurred in defending Jay's prior appeal to our court. The second award was for $40,000 in connection with the contempt proceedings. With respect to the first award, Jay contends, essentially, that he had

grounds to appeal, and that the parties were on an equal footing financially at the time of the decree.

{¶ 102} This award is governed by R.C. 3105.73(A), which states that:

> In an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that action, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable.   In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate

{¶ 103} In awarding appellate fees to Nancy, the trial court noted that the parties had read an agreement into the record, that Nancy presented a decree that was consistent with what was read into the record, and that Jay presented a decree that differed from what was read into the record and then appealed.   The court also noted the testimony of attorney Matthew Sorg, who testified as to the reasonableness of the attorney fees for the appeal, and that the appellate fees were necessary for Nancy to protect her rights.   Doc. #220 at pp. 8-9.   In addition, the trial court did not award Nancy all the fees she incurred in connection with the appeal.

{¶ 104} Trial court decisions to award attorney fees are reviewed under an abuse of discretion standard.   (Citations omitted.)   *Janis v. Janis*, 2d Dist. Montgomery No. 23898, 2011-Ohio-3731, ¶ 78.   "We may not substitute our judgment for that of the trial court unless, when considering the totality of the circumstances, we conclude that the trial court abused its discretion."   *Id.*, citing *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 131, 541

N.E.2d 597 (1989).

{¶ 105} Under the totality of the circumstances, we find no abuse of discretion. As an initial matter, while Jay presented testimony from an attorney, Patricia Duff, who indicated that his appeal was not frivolous, the statute under which the appeal fees were being sought does not require that appeals be frivolous before fees can be awarded. Instead, R.C. 3105.73(A) allows reasonable attorney fees to be awarded based on equitable considerations. Duff did not testify that Nancy's attorney fees for the appeal were unreasonable.

{¶ 106} Furthermore, the evidence indicated that Jay's 2013 income tax return reflected an adjusted gross income of $948,559, while Nancy's 2013 adjusted gross income was only $116,254. *See* Transcript of June 10, 2016 Hearing, pp. 255, 269-271, and Defendant's Ex. AAA, Bates Stamp 000695; Defendant's Ex. H, Bates Stamp 00083. Thus, while the parties apparently obtained equal or equitable martial assets in the divorce, they were far from being on an equal footing in terms of income. Moreover, as was noted, the court's March 24, 2017 decision on the contempt issues and other matters clearly indicates that while the court only held Jay in contempt on one matter, it was highly critical of Jay's conduct. Accordingly, we cannot find that the court abused its discretion in awarding Nancy fees for the appeal.

{¶ 107} The second issue pertains to $40,000 in attorney fees that were awarded to Nancy. As was noted, these fees were awarded under R.C. 3105.73(B), which specifically does not allow consideration of the parties' marital assets in post-decree awards. Instead, the court is limited, in deciding if an award is equitable, to considering "the parties' income, the conduct of the parties, and any other relevant factors the court

deems appropriate."

{¶ 108} The amount of Nancy's attorney fees and expenses that was outstanding by August 1, 2016, was $99,620.15. *See* Defendant's Ex. EEEE, Bates Stamp 001023-001024.[5] In its decision on attorney fees, the trial court concluded that Nancy's attorney fees were reasonable and necessary to enforce the decree. The court relied on the testimony of Nancy's expert, Matthew Sorg, who stated that while a considerable amount of hours were billed due to the complexity of the issues, the hours appeared to be necessary to reach the desired outcome. Doc. #220 at p. 9. The court found that Sorg had presented credible testimony that the services of Nancy's attorney were necessary. *Id.* at p. 13.

{¶ 109} In weighing the equities, the trial court was critical of Jay's actions, including his behavior in designating his trust rather than Nancy as a beneficiary on his life insurance (even though the divorce decree clearly required him to designate Nancy), and Jay's choice to engage in a number of unilateral and self-help actions that caused Nancy to have to pursue legal services that otherwise would not have been required and delayed resolution of the property settlement. *Id.* at p. 10. The court specifically found that Jay's "attempts to unilaterally change the terms of the final decree are inequitable and unjust" and that Nancy incurred the fees in order to protect her property rights. *Id.* In addition, the court focused on the disparity in the parties' incomes. *Id.*

{¶ 110} Furthermore, the court noted that Jay had "delayed in complying with reasonable discovery request[s], causing [Nancy] to file motions to compel. [Nancy] has

---

[5] Nancy made payments on the fees during the pendency of the action; this was the remaining balance as of August 1, 2016.

also had to respond to his contempt motions and the additional ancillary motions to exclude her expert witnesses." *Id.* at p. 11. The court further stressed that Jay's actions "contributed to the additional attorney fees," and that his actions were "intentionally designed [to] confuse, and confound [Nancy] into accepting assets without a set value or with limited or restricted use which were not authorized in the Final Decree." *Id.* at p. 13.

**{¶ 111}** We cannot find that the trial court abused its discretion in awarding attorney fees. The court awarded less than half of the outstanding fees. Nancy's expert testified that the fee amounts were reasonable and necessarily incurred to obtain the desired results, other than a few limited items, like legal research of 2.1 hours for debt issues on June 2, 2016, matters totaling about 4.9 hours on an unrelated civil fraud case in April 2016, and a total of 6.8 hours on July 27 and 28, 2016, for which there was no description of the activity. These hours were billed at $225 per hour, for a total of $3,105. Again, the trial court found Nancy's expert credible.

**{¶ 112}** The court did discount the fee request substantially for some items that it considered unrelated, repetitive, or clerical, based on the testimony of Jay's expert. Again, based on the totality of the circumstances, the trial court did not abuse its discretion in awarding $40,000 in fees to Nancy. As the court noted, the parties' incomes were far from equal, and Jay's actions caused Nancy to incur fees. We agree with the trial court.

**{¶ 113}** Accordingly, the Sixth Assignment of Error is overruled.

## VIII. Fees Awarded to J.R. Hochwalt

**{¶ 114}** Jay's Seventh Assignment of Error states that:

The Trial Court Abused Its Discretion and Its Findings Were Against

the Manifest Weight of the Evidence in Awarding Attorney Fees to Defendant's Expert, J. R. Hochwalt in the Amount of $11,000.00.

**{¶ 115}** Under this assignment of error, Jay contends that the trial court erred in awarding Nancy $11,000 for payments made to her expert, J.R. Hochwalt. According to Jay, Nancy was at fault for incurring these expenses because she failed to accept the fact that $309,000 in IRA funds were properly transferred to her in December 2013 under the decree. In this regard, Jay focuses on the testimony of his own expert, Mark Feuer, who indicated that this money was appropriately transferred. However, Jay's expert was not the only one who testified.

**{¶ 116}** As was noted, R.C. 3105.73(B) allows post-judgment litigation fees to be awarded "if the court finds the award equitable." Again, under the totality of the circumstances, we agree with the trial court that the award was equitable.

**{¶ 117}** As the trial court observed, Jay caused the need for expert assistance by depositing $309,000 into Nancy's IRA account without her consent or knowledge. Contrary to the implication in Jay's brief, Nancy's attorney did not tell Jay's attorney that the transfer was permissible before it occurred. Instead, Crossman told Depoorter on December 10, 2013, that QDROs did not apply to transfers of IRAs, and asked him to forward the appropriate documents for dividing the accounts. *See* Defendant's Ex. 2. There was no dispute at the hearings about the fact that QDROs cannot be used to transfer IRAs; even Jay's expert, Mark Feuer, agreed with Crossman on this point. *See* Transcript of June 9, 2016 Hearing, pp. 20-21.

**{¶ 118}** Instead of communicating further with Crossman, Jay and his attorney unilaterally decided to transfer money into Nancy's IRA account. Crossman's letter of

December 24, 2013, which again asked Depoorter to forward documents, occurred after the transfers had been completed; Crossman clearly had no knowledge that transfers had already occurred. *See* Plaintiff's Ex. 4. Nancy also had no knowledge of the transfer, which was done at a time when Jay still had control of her IRA account.

{¶ 119} Inexplicably, Depoorter contacted Crossman on March 20, 2014, to ask that correct documents be sent to him for dividing the IRAs, when, in fact, the money had already been unilaterally transferred three months earlier. *See* Defendant's Ex. U, Bates Stamp 00295.

{¶ 120} The trial court noted in its decision that the final divorce decree was insufficient to transfer the IRAs into Nancy's account without tax consequences, because the decree did not award Nancy any part of Jay's IRA. The court further commented that the decree placed a duty on Jay to provide proper paperwork, which he failed to do. Doc. #220 at pp. 16-17. In its decision, the court also stated that Nancy had a legitimate concern over the transfer and appropriately contacted J.R. Hochwalt about the issue. The court's observations are supported by the record.

{¶ 121} After Nancy learned in January 2014 of the transfer, she attempted to have Pershing reverse the transfer and also asked Pershing for documents concerning the transfer. However, Pershing refused to comply with any of her requests. In March 2014, Nancy transferred her Pershing funds to AXA Equitable Insurance Company. She stated that she did so to get the account away from Buckingham Capital Management's access so that her accounts were not further affected without her authorization.

{¶ 122} Nancy consulted with J.R. Hochwalt, who filed an amended 2013 tax return for her. Hochwalt, a forensic accountant, and his partner, determined that an

excess contribution had been made to Nancy's IRA for 2013, and contacted the IRS hotline to discuss the facts. Hochwalt also reviewed the divorce documents as well as applicable IRS code sections and regulations.

{¶ 123} Hochwalt testified that there was no court order transferring the money, and without such an order, his option as a certified public accountant was to report the money as an excess contribution until the money was removed from Nancy's account and returned to its original source. According to Hochwalt, the IRS indicates that when an excess contribution is made to an IRA, 6% of the total amount (in this case, around $309,000) would have to be paid every year to the IRS as an excise tax until the money was taken out and returned to its original source. This penalty amounted to $18,547 per year, which Nancy paid for both 2013 and 2014.

{¶ 124} In addition to the amended 2013 return, which reported the excess contribution, Hochwalt submitted Form 843 to the IRS. This form is used to obtain a refund and abatement of excise tax. *See* Defendant's Ex. I, Bates Stamp 00100. Along with other documents (including the divorce decree), Hochwalt sent the IRS a copy of an AXA statement, which indicated that AXA was going to treat the $309,000 deposit to Nancy's Pershing IRA as an excess contribution.

{¶ 125} The excess contribution was also reported on Nancy's 2014 tax return, because when the return was filed in 2015, Nancy had not yet been able to move the money from an IRA account to a non-IRA account. Hochwalt again requested that the IRS abate and refund the 6% excise tax. In August 2015, Hochwalt contacted the IRS about the refund because the IRS had not made a decision. Subsequently, in September 2015, the IRS informed Nancy that it had accepted her explanation for the

overfunding, and that refunds would be issued. *See* Defendant's Ex. YY.

{¶ 126} On January 8, 2016, Jay filed a motion asking the court to hold Nancy in contempt for filing for an abatement in her taxes and for claiming that the funds transferred to her IRA were not qualified. In the motion, Jay claimed that he believed it would be necessary to file a Form 3949A with the IRS because of Nancy's false claims to the IRS. Jay filled out a Form 3949A, which was an informational form telling the IRS that Nancy had been deceptive on her 2015 taxes. *See* Defendant's Ex. SSS, Bates Stamp 000890. According to Hochwalt, the form stated that for Nancy's 2015 tax return, Nancy failed to report $309,121, and that in 2015, she had transferred qualified IRA funds into a non-qualified account without paying federal income tax. Hochwalt indicated that the information Jay intended to send to the IRS was inaccurate.

{¶ 127} The trial court rejected Jay's contempt motion, concluding that the decree did not prohibit Nancy from contacting the IRS for any reason. In addition, the court noted the statement of Jay's attorney in a January 22, 2016 email that Jay had filed the Form 3949A to inform the IRS of Jay's position on the transfer into Nancy's account. The court concluded that Jay's actions had originally caused Nancy to file the Form 843, which was necessary to protect her property rights, and that Jay's actions had also caused a ripple effect that could result in an audit of both parties. Doc. #220 at pp. 5 and 13-14. The court further observed that Nancy's actions were not responsible for the possibility of an audit. *Id.* at p. 14.

{¶ 128} It is true that Jay's expert, Feuer, concluded that Jay's transfer of funds was appropriate. Feuer also stated that the IRS's former decision does not mean that Nancy's position was correct, and that the IRS could choose to audit either party within

certain time frames after their tax returns were filed.

{¶ 129} As was noted, this was a complicated case, and both sides presented expert testimony to support their own motions for contempt and to defend against the other party's contempt motions. Based on the trial court's discussion, it is evident that the court found that Jay's actions caused most of the problems, and that Nancy had to consult experts to assist her in dealing with the effect of Jay's actions. Jay did not present evidence that Hochwalt's fees were unreasonable; he simply argues that Nancy's expert should not be paid because he (Jay) was entitled, in his own expert's view, to transfer the funds. Again, R.C. 3105.73(B) allows litigation expenses based on equitable concerns. On this record, we cannot find that the trial court abused its discretion in requiring Jay to reimburse Nancy for the unilateral actions that he took. We also note that the trial court found the accounting of Hochwalt more credible than the accounting of Jay's CPA. Doc. #220 at pp. 3-4.

{¶ 130} Accordingly, Jay's Seventh Assignment of Error is overruled.

## IX. Conclusion

{¶ 131} Assignments of Error I, II, III, V, VI, and VII having been overruled and Assignment of Error IV having been sustained, the judgment of the trial court is affirmed in part and reversed in part. The judgment of the trial court is reversed with respect to the trial court's award of expert fees for David Suich in the amount of $1,250. In all other respects, the trial court's judgment is affirmed.

. . . . . . . . . . . .

TUCKER, J., concurs.

HALL, J., concurring,

{¶ 132} I agree with the well-reasoned analysis and disposition of Judge Welbaum's opinion. I write separately to make two points: (1) the failure to explicitly and specifically describe on the record or in the Decree of Divorce the nature and extent of the property settlement has led to confusion, and (2) due to that confusion, Jay's contempt should not partly be based on his purported tender, and Nancy's non-acceptance, of the $25,000 health savings account, although his other described post-decree actions are sufficiently contemptuous.

{¶ 133} In the direct appeal from the Decree of Divorce, appellant contended that the settlement agreement allowed Jay to pay Nancy's $1.2 million distribution in four installments from "qualified or non-qualified sources" but, Jay argued, the decree limited that option. We held then that the decree did not require or limit any type of funds for payment. But the term "qualified" is a misnomer. It is apparent that the parties intended that the property division could be paid from either "tax-deferred or non-tax-deferred" funds, regardless of whether a court-ordered QDRO was required. The term "qualified" in "Qualified Domestic Relations Order" means that the order has been "qualified" by the pension or retirement plan as acceptable under the plan and ERISA. "Qualified" does not necessarily mean what the parties here understood, that Jay could divide their property using tax-deferred property, and if so, that portion of the property division would be

taxable to Nancy, not upon transfer, but upon future use. What the decree did not specify—an ambiguity the trial court correctly clarified—is whether Jay could create tax-deferred accounts with after-acquired funds, transfer them to Nancy, and receive credit for the full untaxed account value. We agree with the trial court that he cannot.

{¶ 134} Because of the preceding ambiguity, and our prior indication that Jay was not limited in the type of funds for the property settlement, I do not believe that he should be held in contempt in regard to his failed attempt to pay the $25,000 tax-deferred health savings account simply because it is tax-deferred. On the other hand, if it was created after the divorce with the intent to short-change Nancy's property division, then I would defer to the trial court's finding. Nonetheless, there are several other actions we have enumerated taken by Jay that adequately support the trial court's contempt findings.

Copies mailed to:

Kent J. Depoorter
F. Ann Crossman
Michelle M. Maciorowski
Hon. Steven L. Hurley