[Cite as *In re N.J.*, 2020-Ohio-4158.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

|                   |   |                                    |
|-------------------|---|------------------------------------|
| IN RE: N.J.       | : | Appellate Case No. 28786           |
|                   | : |                                    |
|                   | : | Trial Court Case No. 2014-7337     |
|                   | : |                                    |
|                   | : | (Appeal from Common Pleas          |
|                   | : | Court – Juvenile Division)         |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of August, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Appellee MCCS

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Beavercreek, Ohio 45434
    Attorney for Mother

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which overruled her objections to a magistrate's decision and granted permanent custody of her daughter, N.J., to Montgomery County Children Services ("MCCS"). The judgment of the juvenile court is affirmed.

{¶ 2} The procedural history of the case is as follows.

{¶ 3} MCCS first filed a dependency complaint related to N.J. on November 6, 2014. The complaint stated that N.J. had been placed on a safety plan with a maternal aunt, and that Mother had violated that plan on November 5, 2014, by removing N.J. from the home without permission after arguing with the aunt. N.J. was placed into the emergency custody of MCCS on the same day.

{¶ 4} On November 12, 2014, a magistrate granted temporary custody to MCCS, finding that Mother's "mental health issues" would place N.J. "at serious risk of harm if placed with [Mother] at this time."

{¶ 5} On November 17, 2014, MCCS filed an amended dependency complaint. It stated in part as follows:

> * * * MCCS received this case on a referral while mother was still in the hospital with the child after birth. Mother's behavior was odd. She was yelling at the infant child and not allowing the nursing staff to care for the child. She prohibited * * * hospital staff from conducting the APGAR test or from placing the child on a warmer after birth. She repeatedly attempted to co-sleep with the child against the direction of the nursing staff. MCCS responded to Miami Valley Hospital as a result and placed the child on a safety plan with Maternal Aunt.

{¶ 6} In January 2015, the magistrate conducted a hearing and adjudicated N.J. as dependent, noting that Mother had mental health issues and failed to demonstrate parenting skills, and that N.J.'s father was incarcerated. The magistrate subsequently filed a decision granted temporary custody to MCCS, and the trial court adopted that decision on March 3, 2015.

{¶ 7} On August 3, 2015, MCCS filed a motion to suspend visitation. An affidavit of Regina Howell of MCCS was attached, wherein she stated that Mother had been arrested after an incident during visitation and charged with criminal trespass, resisting arrest, and obstructing official business. The affidavit further explained that Mother had believed that an area of eczema on N.J.'s forehead was a burn mark and created a scene, and that there had been previous complaints about Mother being loud and disruptive at visitation. On September 2, 2015, the magistrate granted the motion to suspend visitation.

{¶ 8} On September 18, 2015, Mother's appointed counsel filed a motion for temporary custody to be granted to a maternal aunt. On September 28, 2015, MCCS filed a motion for a first extension of temporary custody; an affidavit of Regina Howell was attached, which stated that Mother had not completed her case plan.

{¶ 9} On October 16, 2015, after a pretrial hearing, the magistrate issued an order granting Mother supervised visitation at Erma's House if her application for such visitation were accepted. Also in October 2015, the matter came before the court for an annual review/permanency planning hearing. The magistrate issued an order which stated that Mother's case plan was not complete, and the trial court adopted that order. On March 7, 2016, the trial court granted a first extension of temporary custody to MCCS.

{¶ 10} On May 4, 2016, MCCS filed a motion for legal custody to Mother or, in the alternative, a second extension of temporary custody. The attached affidavit of MCCS caseworker Shanta Chilton stated that Mother had made progress on her case plan. On May 25, 2016, the guardian ad litem ("GAL") filed a motion for a second extension of temporary custody to MCCS. The GAL's motion stated that, on May 3, 2016, two weeks after Mother was released from supervised probation for her 2015 resisting arrest conviction, she was arrested on two counts of disorderly conduct, one count of misconduct at an emergency, and one count of resisting arrest. The motion further provided that Mother had pled guilty to one count of disorderly conduct, the remaining charges had been dismissed, and Mother was set to be sentenced in June 2016 in Dayton Municipal Court.

{¶ 11} On October 11, 2016, Mother filed a motion for custody of N.J. On October 31, 2016, the GAL filed a report recommending that legal custody be granted to Mother, with a minimum of 12 months of protective supervision by MCCS. On November 7, 2016, the magistrate conducted a hearing and found that returning legal custody to Mother was in N.J.'s best interest. The order found that Mother had completed her case plan objectives, had addressed the concerns that resulted in N.J.'s removal, had housing and income, and had followed through with recommendations for treatment. The trial court adopted the magistrate's order.

{¶ 12} On February 22, 2018, MCCS filed a motion for temporary custody of N.J. The supporting affidavit of Shanta Chilton of MCCS stated that, on January 24, 2018, N.J.'s previous foster parents had stopped by Mother's home to return some items belonging to N.J. Mother advised the foster parents that she was "feeling anxious, angry,

and irritable and she was concerned about caring for the child and did not want the child to be afraid of her." According to the affidavit, the foster parents took N.J. to their home, and N.J. disclosed that Mother had been hitting her with a belt. The affidavit provided that when Foster Mother bathed N.J., she observed multiple scars on N.J.'s body. The affidavit further stated that when an MCCS employee met with the child on January 26, 2018, the employee observed the scars on N.J.'s body and a bruise on her left eye.

{¶ 13} On March 19, 2019, the GAL filed an updated report, which stated that, according to MCCS, N.J. had scars and injuries on her body, and when asked about the scars, N.J. reported that Mother hit her with a belt every day.

{¶ 14} The trial court held a hearing on March 22, 2019. At the start of the hearing, the parties stipulated that, if the GAL were to testify, "she would testify consistently with her observations, her findings, * * * and her opinions" in her report. Mother's attorney, however, objected to the admission of the report into evidence, on the basis that it contained hearsay statements from the child, who was "incompetent to testify." The trial court overruled the objection.

{¶ 15} Dr. Richard Bromberg, a forensic psychologist, was designated as a parenting specialist expert and a family functioning expert, without objection. Dr. Bromberg testified that he met with Mother in February 2015, conducted psychological and parenting assessments, and created a report. Specifically, he administered the Personality Assessment Inventory, the Substance Abuse Subtle Screening Inventory, the Axis II Personality Disorder checklist for psychological functioning, and the Parenting Stress Index and the Child Abuse Potential Inventory for parenting function. Bromberg stated that he also performed a mental status examination in which he evaluated memory,

common sense, general intelligence, concentration, and attention. Bromberg also testified that he observed Mother with N.J.

{¶ 16} Bromberg's testing and observations led him to conclude that Mother had a personality disorder with features of narcissism, schizoid, and anti-social features, which he described as "extreme personality d[y]sfunction." Bromberg stated that Mother also had disruptive mood dysregulation disorder, and that her moods were "uncontrollable at times." Mother also had oppositional defiant disorder and evidence of a mild intellectual disability, "likely some type of borderline intellectual functioning that was limiting her."

{¶ 17} Regarding his psychological findings, Dr. Bromberg testified that he referenced conditions that "appear[ed] to exist" in his report because the testing "produced results that were very very defensive in nature" and "minimized psychological behavior." He stated that "the Court would have benefitted from having [Mother] more accurately represent herself." Bromberg stated that another doctor had administered a neurological exam to Mother with "full scale intelligence testing" in May 2014, the results of which Bromberg was aware and which he factored into his opinions; Bromberg characterized this test as "the most extensive sophisticated type of psychological testing" and reflected intellectual functioning "that's enduring - - it doesn't change over time." Both tests suggested below average intellectual functioning.

{¶ 18} Bromberg testified that Mother's personality disorder suggested unpredictability, and that "healthy parenting is predictability." He stated that a mood disorder also creates unpredictability, and that the combination of a mood disorder and a personality disorder would "tend to exacerbate each other and make the behavior even

more unpredictable."

{¶ 19} Bromberg testified that N.J. was six months old when he observed Mother with her, and that Mother "worked real hard" at trying to engage the child, but "[k]ind of talked above the child's head, talked to her almost as if she were much older." Near the end of the visitation, N.J. began to cry; Mother told N.J. to stop crying, the child cried more, and Mother became upset and raised her voice to N.J., stating, "Don't be bad." He testified that Mother quickly became "very upset, her temper showed," and that "a somewhat positive family session * * * really ended poorly."

{¶ 20} Bromberg recommended anger management, personality disorder specialized treatment, and individual psychotherapy for Mother. Bromberg testified that specialized treatment "can't be affected successfully by general counseling, it has to be done through DBT, Dialectical Behavior Therapy." He stated that the standard protocol was a minimum of two years of weekly treatment. Bromberg testified that DBT is commonly accepted as the only way to address personality disorders.

{¶ 21} Bromberg testified that Mother "consistently externalize[d] responsibility" to others, and that she did not see herself as the cause of any of her problems. Bromberg testified that, if N.J. were placed in Mother's care, there would be "at least a moderate to high risk of psychological abuse," including yelling and name calling, as well as physical abuse. Bromberg noted that Mother had a felonious assault conviction in her history, and that the Child Abuse Personality Inventory he administered to her "looked like a big red flag." Bromberg opined, to a reasonable degree of psychological certainty, that Mother did not have the knowledge, skills, and ability to parent N.J. independently.

{¶ 22} Shanta Chilton, a caseworker at MCCS, became involved with Mother after

MCCS received a call from the hospital after N.J.'s birth. Chilton testified that Mother denied yelling at the nurses, sleeping with N.J. in bed, and refusing to allow staff to evaluate N.J. Chilton stated that, in the course of talking to Mother, there was an altercation in which Mother yelled at Chilton and said that Chilton was not taking her baby. At the time, Mother did not have housing or employment. Chilton stated that MCCS wanted "to do a safety plan," and Mother stated that her sister was able to take N.J.

{¶ 23} Chilton testified that Mother's case plan objectives were to complete a mental health assessment and follow any recommendations, attend parenting classes, obtain and maintain housing and employment, sign all releases, comply with announced and unannounced home visits, and complete a parenting psychological assessment, including anger management. Chilton testified that Mother received mental health treatment and anger management at Samaritan Behavioral Health and completed two parenting classes. Mother also obtained housing in December 2014 through Opportunities for Ohioans with Disabilities. Chilton testified that Mother "had a few jobs" during the duration of the case, and that she received benefits from Ohio Works First and also received Social Security benefits in 2017. Mother's case was closed in November 2017, but later reopened; Chilton was no longer the caseworker at the time of the hearing.

{¶ 24} Chilton testified that MCCS recommended reunification in 2016 because Mother had followed her case plan "for the most part" and visitation between Mother and N.J. had progressed from a couple of hours to N.J. being in Mother's home over weekends. MCCS made a referral for support services to Agape Reunification Services. Chilton testified that on one occasion, while she and the GAL were visiting Mother at her home, Mother put N.J. on the counter by the stove while cooking and had to be

"redirected."

**{¶ 25}** Chilton testified that, toward the end of her involvement in the case, Mother was seeing a behavior specialist and a therapist at Goodwill Easter Seals; Mother was also in contact with N.J.'s prior foster family, which occasionally took care of N.J. after Mother regained custody to give Mother a break. At that point, MCCS felt that sufficient support was in place for Mother to parent her child. Chilton testified that Mother did not engage in DBT; the person overseeing DBT called Chilton to report that her group was not a "good fit" for Mother because Mother had been argumentative with her over the phone.

**{¶ 26}** Foster Mother testified that she and her husband fostered N.J. from when she was about five months old until she was initially returned to Mother, and then N.J. was been placed with them again when the case was reopened. She stated that six other children also resided in her home. Foster Mother testified that N.J. referred to her and her husband as "mommy" and "daddy" and to the other children in the home as her brothers and sisters. She stated that the other children acted like siblings with N.J.

**{¶ 27}** Foster Mother testified that, after N.J. was returned to Mother, Foster Mother remained in contact with Mother, and N.J. spent "a good amount of time" with the foster family, including staying at their home one weekend a month. Foster Mother testified to observing changes in N.J.'s temperament from the time when she was living in the foster home full time and over the course of the year when she was returned to Mother. According to Foster Mother, she was used to seeing and experiencing a child who was outgoing, initiated play, and had "strong independent skills" such as dressing herself and being potty-trained. But while N.J. was in Mother's care, "she was less

inclined to engage, she almost needed permission * * * to engage in play," and Foster Mother saw "more frequent accidents" and that the independent skills had lessened over time.

{¶ 28} Foster Mother stated that, at the end of January or the beginning of February 2018, she called Mother to ask if she [Foster Mother] could drop off some items that belonged to N.J., and Mother agreed. As soon as Foster Mother entered the home on that occasion, Mother indicated that she needed Foster Mother to take N.J. from the residence, and that "tensions * * * were high." Foster Mother testified that Mother was irritable and N.J. was "very timid" and immediately came to Foster Mother; Mother also disclosed to Foster Mother that she had "not been * * * maintaining her mental health and that that caused some problems, and she * * * needed a break." Foster Mother took N.J. from Mother's home, and "before she was even buckled up into her car seat, * * * [N.J.] began crying" and stated that Mother had hit her every day with a belt. (Mother's attorney objected to this testimony, but the magistrate overruled the objection, stating that the evidence would be given "the weight it deserve[d].")

{¶ 29} Foster Mother further testified that she bathed N.J. the next morning and noticed "visible marks on her body"; she described some scabs and scars on places "like her cheek, the back of her neck, * * * her back, her legs." Foster Mother testified that she asked N.J. about her "boo boos," and N.J. responded, "I told you." (The magistrate overruled another objection from Mother's attorney regarding this testimony.) Foster Mother further testified that N.J. stated, "I told you [Mother] hits me with a belt." Foster Mother stated that she regularly bathed N.J. when N.J. was in her care, and she had never seen visible marks on her body previously. Foster Mother contacted MCCS that

morning. The foster family worked with MCCS to maintain a safety plan for a period of time, but N.J. was ultimately returned to their care.

{¶ 30} Foster Mother testified that, at the time of the hearing, N.J. was four years old, attending preschool, and "thriving." N.J. did not have any developmental special needs. Foster Mother stated that she was still in contact with Mother, who sometimes called and asked to speak with N.J., but that N.J. was not usually interested in speaking. Foster Mother described N.J. as generally "complaint" rather than "excited" about visitation with Mother; Foster Mother testified over objection that N.J. had communicated that she did not want to go to visitation and had asked if she had to go. Foster Mother further stated that the evenings following visitation were "more challenging" because N.J. had accidents more frequently after visits, "sometimes five and six accidents in that day." Foster Mother testified that she and her family were bonded to N.J. and were interested in adopting her.

{¶ 31} Regina Howell, another MCCS caseworker, began working with Mother in 2015 when Chilton was on maternity leave. Howell testified that, at that time, Mother had an apartment and was receiving mental health treatment, and her parenting and psychological assessments were "in the process." Howell stated that, during a visitation at MCCS, Mother observed an eczema patch on N.J.'s head and "screamed and carried on that it was cigarette burn"; the visited ended because Mother could not be calmed down. N.J. was subsequently taken to Children's Hospital, which confirmed that "it was eczema." Howell testified that Mother "couldn't follow the directions of the deputy on duty," and he subsequently had her trespassed from the property. MCCS filed a motion to suspend visitation at MCCS after this incident.

{¶ 32} Howell testified that, in early 2018, MCCS again became involved with N.J., and she was assigned to the case. Howell spoke to Mother, who admitted that she had spanked N.J. with a belt, but Mother denied that N.J. was fearful of her. Howell testified that Mother "made multiple reports" to MCCS with concerns about N.J., such as her hair being too tightly braided, "her skin not being maintained with lotion," and "dirty ears, dirty clothes, dirty face * * * anything about her care that did not meet mom's standards."

{¶ 33} Howell testified that, due to N.J.'s injuries, she referred Mother back to Goodwill Easter Seals or Crisis Care, since she was no longer engaged with mental health services. Mother reengaged with Goodwill Easter Seals in March 2018. Howell testified that she also referred Mother to the Ellis Institute for DBT therapy, and that Mother had engaged in those services, but Howell had not yet received any written records from Ellis Institute. Howell testified that Mother's case plan included maintaining her housing and income, visiting N.J., parenting education, "and being able to demonstrate those learned skills." Mother had appropriate housing and received Social Security; Mother also reported part time employment but had not provided any verification of that employment.

{¶ 34} Howell testified that, although Mother had completed multiple parenting education classes, "it was apparent that there was still a need for some education and [a] better skill set in dealing with her toddler." Howell testified that she attempted to address Mother's anger issues and outbursts when they occurred, but that Mother was not actively engaged in any anger management treatment. According to Howell, getting Mother to "be compliant and maintain [her] mental health in DBT" had been "a struggle." Howell testified that Mother's visitations at MCCS were supervised, with staff redirecting her

when she became loud or angry. She stated that visits have ended in the past because Mother "can't get her emotions under control."

**{¶ 35}** Howell testified that, in addition to Mother's sister who initially failed to maintain the safety plan, MCCS had considered another of Mother's sisters for placement, and her home study was initially approved. However, that sister was subsequently charged with assault and disorderly conduct. Howell later learned that the sister "had been pink-slipped for attempted suicide, so her mental health would not be stable enough" to care for N.J.

**{¶ 36}** Howell testified that Mother visited with N.J. for two hours every Friday; she stated that N.J. was "very timid" during these visited, usually keeping two or three feet between her and Mother for most of the visit. Howell stated that there was not significant interaction between them, but that Mother would ask N.J. "about what's going on" at the foster family's house. Howell stated that she had to intervene during a supervised visit because Mother told N.J. multiple times "to question the caseworker on why her auntie and * * * grandma couldn't come visit," which Howell characterized as "strictly an adult conversation."

**{¶ 37}** Howell testified that MCCS had attempted to get Mother "to calm down, turn the TV down, [and] have appropriate conversations with the child" during visits. At one visit, Mother went "ballistic" because she forgot to bring a fork for the child, and Mother was angry that no one could provide one at visitation. Mother proceeded to feed N.J. a taco salad with her fingers, "making a mess everywhere," and then refused to clean up the mess.

**{¶ 38}** Howell testified that N.J. did not appear to be bonded to Mother, did not get

excited to see her, and was "ready to go" at the end of visitation. Howell had not observed physical affection or interaction between Mother and N.J. and stated that N.J. often had to be coaxed into the room with Mother. N.J.'s interactions with her foster parents were "extremely different from her interactions with mom"; she was excited to go home to the foster home. Howell testified that after one visit had ended early because of "poor behaviors and things" with Mother, N.J. said, "I'm going home and sitting with Daddy [Foster Father]." Howell testified that "home" to N.J. was with her foster family.

{¶ 39} Howell testified that, although Mother was receiving mental health treatment and DBT therapy, MCCS was "not seeing any of the learned skills that we would hope to see" as a result of those therapies. She expected Mother to be able to articulate a dislike in a calm manner "without getting verbally aggressive and assaultive," but Howell observed that soon after the case was reopened, if Mother began to become angry with N.J. while she was being supervised, she would check herself and "immediately got those behaviors in control," but Mother was "not willing to consistently control her behaviors and her attitudes."

{¶ 40} Howell testified that N.J.'s father had been homeless and unemployed during the 2015 case, and this had continued since the time Howell was assigned to this case in February 2018, with the exception of a brief span of past employment. She stated that MCCS did not believe that either of N.J.'s parents would be able to reunify with her or that significant progress would be made in the near future to address its concerns. Howell testified that reunification was not in N.J.'s best interest at this time for her "safety, both physically and emotionally." She opined that granting permanent custody to MCCS was in N.J.'s best interest so that she would have her physical and

emotional needs met "on a consistent basis in a safe and appropriate environment."

**{¶ 41}** On cross-examination, Howell testified that Mother had requested more parenting time, but that the request was not granted due to MCCS's ongoing concerns.

**{¶ 42}** Mother testified that when N.J. was in her care, she did things with her such as going to the mall, getting their hair done and nails painted, and going to the park. Mother also testified that N.J. was bonded to her, called her by her first name, and was .affectionate with her, giving her hugs and kisses. Mother stated that her current apartment had only one bedroom but she was "working on" getting a two-bedroom apartment, and that she had enough room for all of N.J.'s things.

**{¶ 43}** When asked what led to her case with MCCS being reopened, Mother stated that the foster parents had "popped up" at her house to give some of N.J.'s belongings back, and Mother had just expressed to them that she "needed a break." According to Mother, the house she was living in had an infestation of mice and sometimes lacked hot water and heat. She also testified that "it wasn't [her] fault" because she was "living through a program" which was supposed to include payment of her rent, but the house was "messed up," and she remained there because she did not have help.

**{¶ 44}** Mother denied hitting N.J. with a belt every day, stating that she "only whooped [N.J.] with a belt one time" and that it did not leave a mark. Mother testified that she learned in her parenting classes that "[y]ou don't have to necessarily whip them with a belt," but could use alternatives such as "timeout, or take certain things from them" or "talk to them a certain way * * * to make them understand that what they're doing is not right" to curb bad behavior. Mother testified that she had implemented what she had

learned in her parenting classes.   As an example, Mother stated that she explained to N.J. about taking turns when they were playing a game and N.J. "didn't like the fact that it wasn't her turn," which resolved the problem.   When asked how she would discipline N.J. if N.J. were returned to her care, Mother responded, "I wouldn't discipline her at all, I won't put my hands on her or nothing."   Rather, she stated, "I would tell her that you're not suppose [sic] to do that."

{¶ 45} Mother testified that her apartment had working utilities and was appropriate for N.J.   Mother's sister lived down the street and was willing to help her care for N.J., and she had a cousin who was willing to help her too.   Mother testified that she had been receiving consistent mental health treatment since early 2018, and that her counselor helped her cope "with the mental illnesses that they're saying what's wrong with me," such as "don't react to the emotion of it," "tak[ing] a deep breath in, deep breaths out," and "different exercises to help calm yourself down when you're feeling the type of emotions." Mother testified that she began her DBT therapy in August 2018 and attended DBT therapy weekly.   Mother testified that she was seeing a psychiatrist and taking medication and intended to continue mental health treatment; she also hoped to participate in N.J.'s counseling.

{¶ 46} Mother testified that N.J. runs to her at visitation and does not want to leave when it is time for her to go.    Mother denied going "ballistic" about a fork at visitation, saying that at MCCS had provided utensils for food in the past and then suddenly stopped doing so, and that she "just didn't understand why."

{¶ 47} Mother denied that visitation with her caused N.J. to have accidents and that N.J. did not want to see her or talk on the phone.   Mother testified that she felt like

"everybody that was around [her] that was supposed to support [her]," but instead they used things against her "not in [her] better interest." She felt she deserved another chance because she was trying and doing everything that MCCS asked her to do. Mother testified that reunification was in N.J.'s best interest. N.J. knew who she was and who her family was, and Mother did not was her child "growing up to be confused about who she is and where she belong and where she needs to be."

{¶ 48} When asked on redirect examination why she stopped going to therapy after N.J. was returned to her care, Mother stated that she stopped because she did not feel like she needed it anymore "because [her] child was at home." with her.

{¶ 49} At the conclusion of the hearing, the GAL recommended permanent custody to MCCS.

{¶ 50} The magistrate filed an order granting permanent custody of N.J. to MCCS on April 16, 2019.

{¶ 51} Mother filed initial objections to the magistrate's decision in April 2019, and MCCS filed a response. Mother supplemented her objections in July 2019. She argued that the magistrate erred in 1) admitting the testimony of Dr. Bromberg because his testimony was "irrelevant and stale," 2) allowing N.J.'s statements into evidence without establishing her competence, and 3) "allowing testimony about the child's wishes to come from someone other than the GAL," and 4) granting permanent custody to MCCS. MCCS again filed a reply.

{¶ 52} On March 20, 2020, the juvenile court overruled Mother's objections and granted permanent custody to MCCS. With regard to Dr. Bromberg's testimony, the court stated:

Dr. Bromberg's testimony is of relevance to the Court in that Mother had previously been diagnosed with a variety of mental health issues leading to recommendations of intensive treatment when the child was first removed from her. After reunification, Mother stopped engaging in treatment, and the child was eventually removed from her care a second time. After the child was reunified with her, Mother herself testified that she ceased taking her prescribed medication and engaging in her recommended therapy. Mother's mental health has remained a concern across two separate periods of the child being placed outside of her care.

Further, Mother has continued to exhibit angry and aggressive behaviors, including outbursts during her visitations with the child, which have led to multiple visits being ended early. These behaviors appear consistent with Dr. Bromberg's previous observations, as well as past actions by Mother that led to her being trespassed from the Agency for a period of time in 2015. Mother did not begin to engage in specialized treatment such as [DBT] until August 2018, despite being recommended to do so in 2015.

In sum, although dated, Dr. Bromberg's testimony regarding his findings is relevant to exhibit progress, particularly, the lack thereof, that Mother has made in addressing various mental health concerns that have continued to be a barrier to her parenting the child for the majority of the last five years.

{¶ 53} Regarding the testimony about N.J.'s statements, the child's wishes, and

the ultimate disposition of the case, the court determined:

A. Child testimony

* * * Mother does not present any authority to support her position regarding the child's supposed incompetence as barring others' ability to testify about statements the child made to them, particularly regarding potential physical abuse.

The statements at issue were from the testimony of the caseworker and foster mother about statements the child made to them. At no point did the child herself actually testify on the record. Mother's counsel made clear that hearsay was not the basis for her objection, but rather that the child was "incompetent to testify." * * * Additionally, Counsel for Mother apparently waived her right to cross-examine the GAL when she stipulated that the * * * GAL would testify consistently with her observations, findings, and opinions contained in her report. * * *

Even excluding the testimony containing the child's statements, significant testimony still exists to support the Agency's concerns regarding Mother's parenting ability. Mother herself testified that she "whooped the child with a belt", although she disputes the frequency and severity that the child reported to others. Further, the foster mother testified that she observed a number of marks and bruises on the child that she had not previously seen when the child was with her and observed a decline in the child's demeanor and independent self-care skills during the time the child was placed back in Mother's care. The foster mother also observed a

decline in the child's behaviors following visits with Mother after the child's second removal. Additionally, the caseworker observed the child to be timid during visits with Mother and that there didn't appear to be meaningful interaction between the two. The caseworker indicated that she had to intervene during visits due to inappropriate conversations Mother was having with the child, as well as cutting visits short due to Mother's disruptive behavior and inability to control her emotions or appropriately respond to redirection.

B. Child's wishes

Mother asserts that the Magistrate erred in allowing testimony about the child's wishes to come from someone other than the GAL. Mother argues that the Magistrate did not determine that the child was capable of verbalizing her wishes * * *. Mother further argues that the Magistrate did not conduct an in camera interview and did not determine the competency of the child. Mother contends that this testimony can only come from the child during [an] in camera interview or the GAL.

The child's wishes are but one factor for the Court to consider when determining if permanent custody is in the child's best interest. The Ohio Supreme Court has held that "no one element is given greater weight or heightened significance." *In re Schaefer,* 111 Ohio St.3d 498, 2006 Ohio 5513, 857 N.E.3d 532*,* ¶ 56. The only reference to the child's wishes in the Magistrate's Decision was the statement that "the wishes of the child, as either expressed directly by the child or as expressed through the

Guardian ad Litem, with due regard to the maturity of the child was considered." It does not appear from the Magistrate's Decision that the Magistrate specifically referenced or relied on the testimony from the caseworker or foster mother regarding the child's supposed wishes in determining that permanent custody was in the child's best interest.

Further, given the child's responses to the GAL's questions about the child's wishes as stated in the written GAL Report (stating that she wished to live in "America" and not answering questions about living with Mother or her foster parents), the Court would find that the child is too young, at four years old, to sufficiently express her wishes regarding permanency. Therefore, the Court does not give any weight to the caseworker or foster mother's testimony regarding the child's wishes, and any testimony regarding the child's wishes is harmless error.

{¶ 54} The court considered R.C. 2151.414(E), regarding whether the child could be placed with Mother within a reasonable time. It determined as follows:

Despite completion of psychiatric treatment and parenting classes, Mother continues to struggle with her behaviors, which affect her ability to parent the child. These concerns date back to 2014 when the child was first removed from Mother's care. Father remains homeless and without income despite receiving referrals to address those concerns. * * *

* * *

Mother was diagnosed with several mental illnesses and intellectual disabilities in 2015. Mother was engaged in treatment for several years

before discontinuing treatment after the child was reunified with her. After the child was removed for a second time, Mother re-engaged in services, which were ongoing at the time of the hearing. Despite re-engagement in treatment, Mother has continue[d] to struggle with the control of her behaviors and anger management, which has been a concern for Mother dating back to 2014.

\* \* \*

This case was initiated in February 2018 based on allegations of physical abuse, following observations of bruising and scarring on the child, in addition to Mother's admission of whipping the child with a belt. \* \* \*

Multiple factors exist requiring the Court to find that the child cannot or should not be placed with Mother in a reasonable amount of time. \* \* \*

{¶ 55} The court then considered R.C. 2151.414(D), regarding the best interest of the child, as follows:

The child had been in the care of the [the foster parents] for upwards of the previous four years total at the time of the permanent custody hearing. The child appears well bonded to [the foster parents] and well cared for in their home. The child refers to [the foster parents] as "mommy" and "daddy" while she refers to Mother as [Mother's first name].

The child is also bonded to the other children in the foster home, whom she refers to as her brothers and sisters. Mother testified that she believes the child is bonded to her and is affectionate with her. Alternatively, the MCCS caseworker testified that she did not observe a

bond between Mother and N.J., that there did not appear to be meaningful interaction between the two of them during visits, and that the child appeared timid around Mother. The caseworker did not observe the child to be excited to see Mother. This is in contrast to testimony about an observed bond existing between Mother and child during visits following her first removal from Mother's home.

\* \* \*

As discussed above, the Court finds that the child is too young to adequately express her wishes.

\* \* \*

The child was initially removed from Mother's home in November 2014. The child remained in foster care with [the foster parents] until the child was reunified with Mother on November 7, 2016. The child was again removed from Mother's home in February 2018. The child has remained in foster care with [the foster family] since that time. The child was not in Agency custody for twelve or more months of a consecutive twenty-two month period at the time the Agency filed a Motion for Permanent Custody on October 18, 2018.

\* \* \*

At this time, the child has been in Agency custody for nearly four of the last five years over the course of two separate removals from Mother's home. Following the first removal, Mother substantially completed her case plan objectives and was reunified with the child. However, after being

reunified with the child, Mother subsequently stopped complying with her treatment recommendations. A little over a year later, the child was again removed from Mother's care following allegations of physical abuse amongst other concerns with Mother's ability to care for the child.

The caseworker testified that during the visits between Mother and child that she observed, the child appears timid and there is little significant interaction between the two. The foster mother testified about a regression in various behaviors and self-care skills that occurred with the child during the course of time she was placed back in Mother's home in 2017. The child has been in the [foster] home for the duration of time that she has been out of Mother's care. The child appears well cared for in the * * * home and is bonded to them. [The foster parents] have been identified as an adoptive placement for the child.

Although Mother has completed various case plan objectives, concerns still remain, primarily her ability to appropriately parent the child. * * *

The Court finds that the child's need for a legally secure placement cannot be achieved without a grant of permanent custody to MCCS. Mother has failed to successfully remedy her behaviors and concerns, which have twice caused the child's removal from her home. It also appears that the child's relationship with Mother has declined over time, particularly following the second removal.

{¶ 56} Based on its findings that N.J. could not be returned to Mother's custody

within a reasonable period of time and that it was in N.J.'s best interest to award permanent custody to MCCS, the trial court granted MCCS's petition for permanent custody.

{¶ 57} Mother asserts two assignments of error on appeal. For ease of analysis, we will consider her second assignment of error first. It states:

> THE JUVENILE COURT ERRED WHEN IT PERMITTED HEARSAY STATEMENTS BY THE CHILD BECAUSE THE CHILD WAS NOT SHOWN TO BE COMPETENT.

{¶ 58} Mother asserts that alleged statements from N.J. were admitted into evidence through the GAL's report and in Foster Mother's testimony, and that the trial court erred when it allowed these statements into evidence because, at age 4, N.J. was presumed incompetent. She also points out that the trial court did not examine N.J. to see if she was competent to testify. She relies on Evid. R. 601.

{¶ 59} MCCS responds that N.J.'s out-of-court statements were not inadmissible on the basis of incompetency or hearsay and that Mother's reliance on Evid. R. 601 was misplaced. According to MCCS, the purpose of Evid.R. 601 is to address who is competent *to testify*, but N.J. was not called to testify during the permanent custody hearing; as such, "any objection calling into question her competency to testify was properly overruled by the trial court."

{¶ 60} MCCS further asserts that Foster Mother's testimony that N.J. reported being hit with a belt by Mother was offered to explain how MCCS became involved with the family for a second time; Foster Mother made a referral to MCCS after she saw the bruises and scars on N.J.'s body. According to MCCS, whether it was true that Mother

physically abused N.J. with a belt "was never at issue in the permanent custody hearing."

**{¶ 61}** Regarding the GAL report, MCCS asserts that GAL reports are not presented as factual evidence, but as "an informed recommendation about the child's best interest" to assist the juvenile court.   MCCS asserts that the out-of-court statements recounted in the GAL's report were offered to explain the GAL's ultimate recommendation and were not inadmissible hearsay.   Moreover, MCCS contends that even if the juvenile court erred in allowing Foster Mother to testify about N.J.'s statements and in admitting the GAL's report, it was harmless error because an appellate court presumes that a trial judge "considered only relevant, admissible material in arriving at the judgment."   Finally, MCCS asserts that the trial court's decision to grant permanent custody of N.J. to MCCS was based upon Mother's inability to address her mental health and anger management concerns, not the alleged abuse.

**{¶ 62}** Evid.R. 601(A) states: "Every person is competent to be a witness except as otherwise provided in these rules."   We agree with MCCS that Mother's reliance upon this rule is misplaced, as the rule applies to *witnesses* who are providing *testimony* under oath, and N.J. did not testify.

**{¶ 63}** We note that Mother did not object to the admission of the GAL report, and therefore she has waived this portion of this assigned error. Further, this court has noted:

> * * * It is true that, " '[o]rdinarily, a GAL's report is not considered
> evidence.' " *Pettit v. Pettit,* 12th Dist. Fayette No. CA2011-08-018, 2012-
> Ohio-1801, ¶ 80, quoting *In re Daneasha Sherman,* 3d Dist. Hancock Nos.
> 05-04-47, 05-04-48, 05-04-49, 2005-Ohio-5888, ¶ 29; *see also In re*
> *Robinson/Brooks Children,* 5th Dist. Stark No. 2004-CA-00094, 2004-Ohio-

6142, ¶ 13 (saying that "a guardian ad litem's report should not be considered evidence"). This is because "[a] guardian ad litem is an agent of the court," *In re Alfrey,* [2d Dist. Clark No. 01 CA0083, 2003-Ohio-608] at ¶ 16, and in a permanent custody proceeding, a written report by the GAL is required by statute, *see* R.C. 2151.414(C),[1] "to give the court information, in addition to that elicited at the hearing, to assist it in making sound decisions concerning permanent custody placements," *In re Hoffman,* 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 13. A GAL report, then, " 'is merely submitted as additional information for the court's consideration, similar to a pre-sentence investigation report in a criminal proceeding.' " *Pettit* at ¶ 80, quoting *In re Daneasha Sherman* at ¶ 29.

*In re K.W.*, 2d Dist. Clark No. 2013-CA-107, 2014-Ohio-4606, ¶ 17.

**{¶ 64}** Mother's argument that N.J.'s statements in the GAL report were inadmissible is without merit.

**{¶ 65}** With respect to N.J.'s statements to Foster Mother, we note that those statements were already part of the record; they were contained in MCCS caseworker Chilton's affidavit attached to the February 22, 2018 motion for custody. More significantly, the juvenile court made clear that "[e]ven excluding the testimony [of Foster Mother] containing the child's statements, significant testimony still exist[ed] to support the Agency's concerns regarding Mother's parenting ability." We agree; even if we were

---

[1] R.C. 2151.414(C) states: " * * * A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section or section 2151.35 of the Revised Code but shall not be submitted under oath."

to find that the juvenile court erred in admitting N.J.'s statements to Foster Mother, additional overwhelming evidence supported the juvenile court's decision to grant permanent custody to MCCS, as explained in detail below.   For these reasons, Mother's second assignment of error is overruled.

{¶ 66} Mother's first assignment of error states:

THE JUVENILE COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY OF THE CHILD TO [MCCS.]

{¶ 67} Mother asserts that it was in N.J.'s best interest to be returned to her mother, noting that she had completed multiple parenting classes, was "engaged in mental health services," was receiving DBT therapy, and, according to her own testimony, had a close bond to N.J.   She notes that she asked the foster parents to take N.J. in January 2018 for reasons that were not her fault, namely a mouse infestation and no heat and hot water in the home.   Mother asserts that she only hit N.J. with a belt once, that it did not leave a mark, and that she had since learned alternative methods of discipline.   Mother also points to her testimony that she was compliant with her medications and would continue both her mental health treatment and DBT therapy.   She states that she has maintained housing and income.

{¶ 68} Based on our review of the evidence, the juvenile court did not abuse its discretion in granting permanent custody of N.J. to MCCS.   This Court has previously noted:

"In a proceeding for the termination of parental rights, all of the court's findings must be supported by clear and convincing evidence."   *In re M.S.,* 2d Dist. Clark No. 2008 CA 70, 2009-Ohio-3123, ¶ 15, citing R.C.

2151.414(E). "A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.' " *In re R.L.,* 2d Dist. Greene Nos. 2012CA32, 2012CA33, 2012-Ohio-6049, ¶ 17, quoting *In re A.U.,* 2d Dist. Montgomery No. 22287, 2008-Ohio-187, ¶ 9. We review the trial court's judgment to see whether the court abused its discretion[2]. *See In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48.

This case is controlled by the statute governing the disposition of a dependent child, R.C. 2151.353, which provides in part that a court may commit the child to the permanent custody of a public children services agency if the court finds, one, that "the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent" (the parental-placement finding) and, two, that "the permanent commitment is in the best interest of the child" (the best-interest finding). R.C. 2151.353(A)(4).

*In re K.W.,* 2d Dist. Clark No. 2013-CA-107, 2014-Ohio-4606, ¶ 7-8.

---

[2] W have defined an abuse of discretion as "an attitude that is unreasonable, arbitrary, or unconscionable." *Mossing-Landers v. Landers*, 2016-Ohio-7625, 73 N.E.3d 1060, ¶ 21 (2d Dist.), quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990); *Buckingham v. Buckingham*, 2d Dist. Greene No. 2017-CA-31, 2018-Ohio-2039, ¶ 54. We have also repeatedly stressed that " 'most instances of abuse of discretion will result in decisions that are simply unreasonable,' " and that decisions are unreasonable if they are unsupported by a sound reasoning process. *AAAA Ents.* at 161; *Myers v. Brewer,* 2017-Ohio-4324, 91 N.E.3d 1249, ¶ 12 (2d Dist.); *Buckingham* at ¶ 54.

{¶ 69} Mother challenges the juvenile court's best interest finding. With respect to best interest, we further stated in *In re K.W:*

> R.C. 2151.414 provides that in finding that "the permanent commitment is in the best interest of the child" a court must consider all relevant factors, including the statutory factors listed in division (D) of the section: "(1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child * * *; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11)[3] are applicable." *In re S.J.,* 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15.

*In re K.W.* at ¶ 13.

{¶ 70} Regarding N.J.'s interactions and interrelationships, Howell testified that despite completing two parenting classes, parenting education was again required in Mother's case plan after N.J.'s second removal, because Mother was unable to demonstrate learned skills. Howell testified that she did not observe significant interaction between Mother and N.J., that Mother engaged in inappropriate conversations with N.J. at visitation, and that Mother went "ballistic" over her inability to obtain a fork for the child. While Mother testified that she and N.J. shared a bond and affection, Howell testified that N.J. was not bonded to Mothern or excited to see her, often having to be

---

[3] The juvenile court determined, and we agree, that these factors are not applicable.

coaxed into the visitation room. Mother acknowledged that she stopped her recommended mental health services once N.J. was returned to her and that she subsequently hit N.J. with a belt. Howell testified that N.J.'s relationship with her foster family was "extremely" different and that she was excited to go to their home after visitation. Howell testified that after one visitation was cut short by Mother's conduct, N.J. stated that she was going home to "Daddy" (Foster Father).

{¶ 71} Foster Mother's testimony corroborated Howell's. Foster Mother testified that N.J.'s temperament changed markedly over the year after she left her home. Foster Mother testified that N.J. was less inclined to engage in play, and that her skills regressed to the point of having five to six accidents a day after a visitation with Mother. Foster Mother testified that N.J. was bonded to her foster family and was thriving.

{¶ 72} Regarding her custodial history, the trial court noted that N.J. had spent most of her young life in the care of her foster parents. Dr. Bromberg testified that Mother did not have the knowledge, skills, and ability to parent N.J. independently to a reasonable degree of psychiatric certainty. It was clear that N.J. needed a legally secure placement and that such security could not be achieved without a grant of permanent custody to MCCS. In other words, the juvenile court's finding that granting permanent custody to MCCS was in N.J.'s best interest was supported by clear and convincing evidence, and no abuse of discretion is demonstrated.

{¶ 73} Mother's first assignment of error is overruled.

{¶ 74} Having overruled both of Mother's assigned errors, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . .

TUCKER, P. J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
Robert Alan Brenner
Mary Ellen Ditchey
Kimberly Salzl, GAL
Hon. Helen Wallace